STATE of Iowa, Appellee,

v.

Larry Thomas SIEMER, Appellant.

No. 88–1899.

Supreme Court of Iowa.

April 18, 1990.

Patricia M. Hulting of Roehrick, Hulting & Moisan, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Ann E. Brenden, Assistant Attorney General, James Smith, County Atty., and Melodee Hanes, Asst. County Atty., for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, CARTER, and NEUMAN, JJ.

NEUMAN, Justice.

The principal question posed by this appeal is whether the armor of parental authority is strong enough to shield a defendant from prosecution and conviction for the criminal confinement and torture of a child. We think not, and affirm defendant Larry Siemer's conviction for first-degree kidnapping.

### I. *Background facts and proceedings.*

Defendant Larry Siemer is the live-in boyfriend of Donna Simmons, and together they were charged in June 1988 with the kidnapping of Donna's seven-year-old son, Tracey.[1] The charge arose out of events beginning in December 1987 and continuing until April 1988 when Tracey was rescued by Des Moines police and child protection workers. The unspeakable horror of the case is revealed through the testimony of the young victim, his ten-year-old sister April, and the authorities who finally came to Tracey's aid.

The evidence discloses that Siemer began physically abusing Tracey in the fall of 1987. The abuse escalated after Christmas, at which time Tracey was banished to the furnace room of the basement. The room's entrance was covered with a dirty blanket, its windows were boarded over, and there was no light. There Siemer handcuffed Tracey to the rusty box springs that served as his bed. Tracey had no access to a toilet and was forced to lie in his own waste. A make-shift toilet made of a bucket and chair was eventually placed next to the bed so that Tracey could relieve himself without being freed from the handcuffs.

Siemer instructed April to handcuff Tracey to his bed every day after school. On Siemer's orders she also released him every morning at 6:30 a.m. to attend school. Tracey spent the weekends locked to his bed in the basement. Siemer told April to feed

---

1. In a separate opinion filed today we have affirmed Donna Simmons', first-degree kidnapping conviction. *See, State v. Simmons,* 454 N.W.2d 866 (Iowa 1990).

Tracey "a little food" each day but otherwise to "forget about him."

Tracey testified that from January through April Siemer beat him with a board and belt, hung him naked from a pipe in the ceiling, submerged him in ice water, cut him with a knife across his buttocks, fed him cat food, poured scalding hot water over his lower abdomen and genitals, and threatened him with further abuse if he dared reveal his plight. Medical experts testified that Tracey suffered permanent injuries from the scalding.

At no time did Tracey's mother, Donna Simmons, intervene on his behalf. April was sworn on the pain of her own punishment to keep Siemer's "secret." Eventually, one of April's playmates saw Tracey in the basement and told her parents who alerted authorities. On the day Tracey was rescued, he was found huddled under filthy blankets in his dark and foul-smelling dungeon, shaking uncontrollably from the pain of second-degree burns to his genitals.

Tracey's rescue predictably attracted wide media coverage. Iowa's only statewide newspaper, the Des Moines Register, extensively covered every aspect of the case. Typical headlines read "Des Moines Man Charged in Torture of Boy, 7," "Grandfather Tells of Threats in Torture Case," and "Mother Accused of Aiding Fiance in Torturing Seven–Year–Old." The record contains fourteen articles, including two from the newspaper's front page, and fifty-three television and radio broadcasts which directly featured the case. The media coverage tapered off during June and July, ceased in August, and flared up again in September as the trial date approached. The trial began on October 12, 1988.

Prior to trial, Siemer moved for the appointment of a communication expert to assess the impact of the news reporting on the attitudes of prospective jurors. Following denial of that motion, he moved for a change of venue on the ground that a fair trial could not be obtained in Polk County. That motion was likewise overruled, as well as a renewal of the same motion just prior to trial.

When jury selection commenced, all but one of the original panel of thirty-two jurors reported having heard of the case. Twenty of the thirty-two members of the panel admitted responding negatively to allegations that a child had been beaten, handcuffed, and confined in a damp basement. When pressed by defense counsel about their negative feelings, however, many equivocated. Several jurors attempted to explain what they perceived to be the difference between their reaction to the original charges and their duty not to prejudge the defendant. The following colloquy with defense counsel exemplifies the jurors' attitude and counsel's resistance to it:

Q. Just by virtue of walking in this courtroom you've changed your mind?

A. No. When you first read an article, and not that I believe everything that I read in the Register, but when you read an article and it's something that happens to a child or anybody, anything that happens, that happens to be awful, that you just automatically think oh, this is bad, and then you're put in a position that us as juror that it's up to us to decide if a person is guilty. Then I think you think twice of it. You don't understand what I'm saying.

Q. Well, that's fine. It doesn't matter. I want you to say whatever you really feel.

A. Well, that's the way I feel.

The first day of voir dire, counsel moved to strike the entire panel because of the negative attitudes held by twenty of the thirty-two members of the panel. The court denied the motion but thereafter permitted counsel to voir dire the jurors individually. At the close of the second day counsel renewed his motion to strike the entire panel, citing the prejudicial impact of the news reporting. The motion was denied.

A total of twenty-three jurors were dismissed for cause. Eleven were dismissed when they admitted that the nature of the charges would hinder their ability to judge impartially. Three were dismissed who had read newspaper accounts of plea nego-

tiations during the first and second days of voir dire. Two were dismissed because of their familiarity with parties linked to the case. Seven jurors who held negative impressions were dismissed even though several indicated that their negativism related to the allegations themselves and not to the defendant, or that they were capable of setting aside those negative feelings and deciding the case solely on the evidence presented.

Of the twelve jurors who were ultimately seated, only one had not heard of the case. Six of the eleven jurors familiar with the case had formed no opinion toward the defendant. One juror reported being "shocked" by the allegations but felt he was capable of setting aside his initial reaction. Two other jurors who originally held a negative impression stated that their oaths as jurors would assure their commitment to judge impartially. One juror changed her reaction from negative to "no opinion" based on the fact that she did not have enough information about the case. The last juror stated that although she believed the crime was "terrible," she had not given a thought to the "individual people" involved.

At the conclusion of voir dire, defense counsel again moved for change of venue. The court denied the motion based on defendant's failure to establish either actual or presumptive prejudice. As a last resort, the defendant moved to waive his right to a jury trial. The State resisted the motion. The court rejected defendant's request because Iowa Rule of Criminal Procedure 16(1) does not permit a defendant to waive a jury within ten days of trial without the State's consent.

The jury found Siemer guilty as charged. On appeal, Siemer seeks reversal on the following grounds: (1) the trial court's refusal to change venue denied him a fair trial; (2) because he stood *in loco parentis* with the victim, he cannot be convicted of kidnapping as a matter of law; (3) the State failed to prove that Tracey's confinement was more than incidental to the underlying crime of child abuse; and (4) the rule requiring prosecutorial consent to

waive a jury within ten days of trial violates defendant's constitutional right to trial by jury. We shall consider the arguments in the order presented.

## II. *Change of venue.*

■ Iowa Rule of Criminal Procedure 10(10)(b) provides that upon motion of the defendant, the trial court may transfer venue to another county

> [i]f the court is satisfied ... that such degree of prejudice exists in the county in which the trial is to be had that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county....

This right to a fair trial by impartial jurors has its underpinnings in our state and federal constitutions. *Irvin v. Dowd,* 366 U.S. 717, 721, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961); *State v. Walters,* 426 N.W.2d 136, 138 (Iowa 1988). Accordingly, we review de novo the record made for purposes of challenging the denial of a motion for change of venue. *State v. Gavin,* 360 N.W.2d 817, 818 (Iowa 1985). Reversal is warranted only where the trial court's decision demonstrates an abuse of discretion. *State v. Harris,* 436 N.W.2d 364, 367 (Iowa 1989); *Walters,* 426 N.W.2d at 138; *State v. Robinson,* 389 N.W.2d 401, 403 (Iowa 1986).

A defendant relying on jury prejudice as a ground for reversal must show (1) publicity attending the trial that is so pervasive and inflammatory that prejudice must be presumed, or (2) actual prejudice on the part of the jury. *State v. Spargo,* 364 N.W.2d 203, 207 (Iowa 1985). Siemer claims that the record supports reversal on either ground. We cannot agree.

To sustain a claim of presumptive prejudice, the defendant must prove that the publicity attending the case was "pervasive and inflammatory." *Harris,* 436 N.W.2d at 367. Whether publicity rises to the level of being presumptively prejudicial depends on the following factors: the nature, tone, and accuracy of the articles; their timing in relation to the trial; and the impact of the publicity on the jurors as revealed through voir dire. *Walters,* 426 N.W.2d at 139.

It cannot be reasonably argued that the media coverage attending Tracey's discovery and Siemer's arrest was not pervasive. It is equally true, however, that the nature and tone of the reporting of these events was predominantly factual and no more sensational than the crimes alleged. *See id.* (distinguishing "sensational reporting of a routine crime" from "routine reporting of a sensational crime"). None of the media reports indicated that Siemer was guilty of the crimes charged. *See Spargo,* 364 N.W.2d at 207. The press reports consisted largely of facts which were ultimately introduced at trial. Only minor inaccuracies appear. For example, it was reported that the victim was "poked" with a knife when in fact April stated that she saw Siemer "run a knife along" Tracey's buttocks. Other news reports indicated that Tracey suffered rope burns around his neck. That this allegation of abuse turned out to be nonfactual is not, we think, of such magnitude as to create a presumption of prejudice when considered in the light of other horrific evidence reported and proved at trial.

The passage of time abated the barrage of media coverage which occurred when the story first broke. *Cf. Robinson,* 389 N.W.2d at 403 (time span did nothing to improve defendant's chance of fair trial). The publicity generated near the time of trial largely consisted of announcements setting the trial date and counsel's efforts to secure a change of venue. As for the voir dire process itself, we have held that mere exposure to news accounts will not create a presumption of prejudice. *State v. Ware,* 338 N.W.2d 707, 713 (Iowa 1983). Although all but one member of the initial panel admitted a general familiarity with the crime based on news reports, the court exercised abundant caution in dismissing for cause the venire persons who held negative attitudes toward the crime, generally, or against Siemer, particularly. That brings us to consideration of defendant's claim of actual prejudice.

Because a fair trial by an impartial tribunal is the most essential requirement of due process, the United States Supreme Court has recognized that trial courts must carefully scrutinize jurors' protestations of impartiality where large numbers of venire persons hold fixed opinions of the accused's guilt. *Irvin,* 366 U.S. at 727–28, 81 S.Ct. at 1645, 6 L.Ed.2d at 758–59. More recently, however, the Court has reaffirmed the importance of deferring to the trial court's sound judgment in such matters since the determination is "essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847, 858 (1984). Voir dire testimony that appears ambivalent or contradictory on a cold record is known to be more accurately assessed by the trial court who hears the jurors firsthand and who understands that the testimony is often the product of leading questions and cross-examination tactics employed by counsel against jurors who, unlike witnesses, have no briefing by lawyers prior to taking the stand. *Id.* at 1039, 104 S.Ct. at 2893, 81 L.Ed.2d at 859.

Applying the principles of *Irvin* and *Patton,* we conclude that Siemer has failed to show actual prejudice. Although sixty-two percent of the panel members questioned were dismissed for cause because they expressed preconceived notions about Siemer's guilt, of the jurors actually seated, only five reported holding an initial "negative" impression of Siemer and none professed a fixed belief concerning his guilt. Moreover, it is apparent from the record that any equivocation on the part of the jurors dismissed for cause was prompted by defense counsel's relentlessly leading questions concerning their views about defendant's guilt. Unlike those dismissed for cause, the five jurors who initially held negative impressions toward Siemer each stated straightforwardly that those views could be set aside and would not affect their ability to impartially consider the evidence. These protestations of impartiality were convincing to the trial court and we have no reason to doubt their credibility from the record before us. Based on the totality of the circumstances, we cannot say that the trial court abused its discretion by refusing to grant a change of venue in this case.

## III. *Kidnapping.*

Siemer's challenge to his kidnapping conviction is two-pronged. First, he claims that because an absence of authority to confine is one of the essential elements of the crime, no parent (or person acting on a parent's authority or *in loco parentis*) could be found guilty of such crime because the authority to confine inheres in the parent/child relationship.[2] Second, Siemer contends that even if a parent may be prosecuted for kidnapping, the record before us contains insufficient evidence of confinement independent of the abuse itself to sustain a conviction. We shall consider the arguments in turn.

**A.** *Authority.* Under Iowa law, the crime of kidnapping charged in this case contains the following elements:

(1) confinement of the victim

(2) without authority or consent

(3) with the intent to inflict serious injury or secretly confine.

Iowa Code § 710.1 (1989). First-degree kidnapping is established by proof that the person kidnapped (or, in this case, *confined*) was intentionally subjected to torture. Iowa Code § 710.2.

The only element in dispute is the one relating to authority. The trial court ruled that the authority of a parent is limited by "the bounds of moderation." Accordingly, the court instructed the jury to determine whether Siemer's conduct "constituted proper discipline, within reason and the bounds of moderation for the best interests of the child, or whether it was conduct of such undue severity or cruelty that it did not constitute proper discipline." Siemer objected to this instruction and proposed the following alternative: "If you find ... that the defendant was acting as a parent then you must find the defendant not guilty of kidnapping." The trial court rejected this instruction.

Siemer contended at trial, and urges on appeal, that the legislature included an "authority" exception within section 710.1

to immunize parents from the crime of kidnapping. He buttresses his argument by reference to the common-law rule developed in child custody disputes that a parent with lawful custody cannot be found guilty of kidnapping for taking and concealing his or her own child. *State v. Dewey*, 155 Iowa 469, 471, 136 N.W. 533, 534 (1912); *see, generally,* Annotation, *Kidnapping or Related Offenses by Taking or Removing of Child by or Under Authority of Parent or One In Loco Parentis*, 20 A.L.R.4th 823, 826 (1983 & 1986 Supp.).

Like the district court, however, we are unwilling to accept the proposition that concealing a child in the context of a custody dispute is equivalent to concealing a child with the intent to abuse and torture. A parent's right to custody and control of a child is not absolute. *McCalester v. Hillcrest Serv. Child. & Youth*, 232 N.W.2d 1, 2 (Iowa 1975). Moreover, we have long held in this state that a parent's right to chastise a child does not extend to "cruelty or inhumanity," for if punishment "goes beyond the line of reasonable correction, [the parent's] conduct becomes more or less criminal." *State v. Bitman*, 13 Iowa 485, 486 (1862). Abusive punishment "annuls the parental privilege and subjects the parent to applicable criminal statutes." *State v. Bell*, 223 N.W.2d 181, 184 (Iowa 1974).

The real question posed by Siemer is whether, under any circumstances, a parent who has control over a child should be subjected to life imprisonment for abusing that privilege. Siemer argues that the legislature has enacted child endangerment statutes to penalize parents for the sort of criminal conduct demonstrated by this record. *See* Iowa Code § 726.6 (defining child endangerment and making it a class "C" felony). Preservation of the authority exception in the kidnapping statute is critical, Siemer argues, because without it prosecutors will routinely bootstrap lesser crimes into serious kidnapping offenses.

---

**2.** Neither the State nor defendant challenges Siemer's status as a person standing *in loco* *parentis* to the victim.

In support of this argument, Siemer relies on a case in which the Arizona Supreme Court reversed a conviction for kidnapping lodged against a mother who locked her four-year-old daughter overnight in a storage locker which served as their "home." *See State v. Lawrence*, 135 Ariz. 569, 663 P.2d 561 (1983). In *Lawrence*, the Arizona court held that the phrase "without legal authority" rendered the false imprisonment statute inapplicable because of the defendant's status as a parent. *Id.* at 571, 663 P.2d at 563. The court rejected a reasonableness standard as a limit on parental authority because "the determination of what is or is not a reasonable restraint would be left to jury determination in each case without any standard by which to be guided." *Id.* at 571, 663 P.2d at 563.

We note that *Lawrence* has been recently distinguished by the Arizona Supreme Court in a decision upholding a parent's conviction for kidnapping. *See Arizona v. Viramontes*, 163 Ariz. 334, 788 P.2d 67 (1990). The opinion is persuasive and highly instructive on the issue confronting us. We thus examine it in some detail.

In *Viramontes*, the defendant fathered a child by his thirteen-year-old stepdaughter and, to conceal the birth, took the newborn and abandoned it in the parking lot of a fast-food restaurant. The defendant pleaded guilty to kidnapping and child abuse but the intermediate appellate court reversed the kidnapping conviction in conformity with *Lawrence*, reasoning that because defendant was the child's father the State could not prove the requisite lack of authority. On further review, the Arizona Supreme Court held that *Lawrence* was not controlling because the restraint in *Lawrence* was prompted by the mother's lawful (albeit misguided) intent to shelter her child whereas Viramontes' intent was to abandon his infant, a crime punishable in Arizona as a felony. *Viramontes*, 163 at 336, 788 P.2d at 69.

Concluding that a parent cannot acquiesce in the restraint of his or her child for any of the purposes enumerated under the kidnapping statute, the Arizona court held that the focus of the authority inquiry must be directed at the purpose of the restraint and the defendant's intent. *Viramontes*, 163 Ariz. at 337, 788 P.2d at 70. We quote with approval the court's reasoning:

> Regardless of any custody rights defendant may have possessed over the infant, he cannot assert that he had legal authority to engage in the action that resulted in abandonment of the child, which constitutes child abuse. "Legal authority" implies that behavior is sanctioned by law. Parents have authority to reasonably and appropriately discipline their children. However, parents do not have legal authority to subject their children to felonious acts. Although legal authority has not been defined by the legislature, under no imaginable circumstances could the legislature have intended that defendant's intent in taking the child to abandon it be legally authorized.

*Viramontes*, 163 Ariz. at 337–338, 788 P.2d at 70–71 (citations omitted).

Like the Arizona court, we are persuaded that parents may not hide behind the guise of authority to escape punishment for conduct that is proscribed for all others by the kidnapping statute. Other jurisdictions that have addressed the question have similarly concluded that the authority vested in parents does not immunize them from conviction for acts of unlawful restraint or kidnapping. *See People v. Walker*, 130 Ill.App.3d 58, 61, 85 Ill.Dec. 396, 398, 473 N.E.2d 995, 997 (1985) (holding son hostage is not reasonable exercise of parental authority); *State v. Warner*, 98 Ill.App.3d 433, 435–36, 53 Ill.Dec. 956, 958, 424 N.E.2d 747, 749 (1981) (confinement of child to unventilated bedroom for thirty days during summer is not reasonable exercise of parental authority); *Highley v. State*, 535 N.E.2d 1241, 1246 (Ind.App. 1989) (parental authority does not exempt defendant from criminal sanction for holding girlfriend's sons hostage for seven and one-half hours with loaded rifle); *State v. Alladin*, 408 N.W.2d 642, 647 (Minn.App. 1987) (upholding kidnapping conviction of parent who held two-year-old daughter hostage for five hours); *State v. Tuitasi*, 46

Wash.App. 206, 209, 729 P.2d 75, 77 (1986) (parent acted "without legal authority" by threatening to take child from custodial parent for purpose of coercing custodial parent into engaging in sexual intercourse); *State v. Teynor*, 141 Wis.2d 187, 198, 414 N.W.2d 76, 79 (1987) ("a parent may commit the offense of false imprisonment against the parent's child").

Because of the disparate objectives which kidnapping and custodial interference statutes seek to accomplish, we reject Siemer's argument that the limited immunity granted parents in the custody context applies to the case before us. The harm the kidnapping statute addresses is *unlawful* confinement or asportation which increases the potential or actual injury to the victim. *See State v. Ramsey*, 444 N.W.2d 493, 495 (Iowa 1989). While a parent has the authority to confine or remove a child under reasonable circumstances, we can conceive of no circumstance under which a parent could lawfully exercise such authority while harboring the intent to sexually abuse or subject the child to serious injury. We thus hold that parents, or persons standing *in loco parentis*, are not beyond the reach of the kidnapping statutes as a matter of law. We find no error in the trial court so ruling.

■ B. *Sufficiency of the evidence.* Citing the rule that the kidnapping statute requires proof of confinement or removal which exceeds that normally incidental to the commission of the underlying offense, *State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981), Siemer argues the State failed to prove confinement beyond that inherent in the abuse inflicted upon the child. In other words, Siemer argues that handcuffing Tracey to his bed for three months *was* the abuse and cannot stand as a separate crime of kidnapping. We find the argument entirely without merit.

In order to prove the crime of kidnapping, the State must establish confinement that exceeds what is normally incidental to the underlying crime (for example, serious injury or sex abuse) by proof that the confinement

substantially increases the risk of harm to the victim, significantly lessens the risk of detection, or significantly facilitates escape following the consummation of the offense. *State v. Hardin*, 359 N.W.2d 185, 189 (Iowa 1984) (quoting *Rich*, 305 N.W.2d at 745); *State v. Greiman*, 344 N.W.2d 249, 252 (Iowa 1984). When considering a challenge to the sufficiency of evidence, we view the record in the light most favorable to the State, including all legitimate inferences which may fairly and reasonably be drawn therefrom and determine whether there is substantial evidence to support the verdict. *State v. Blair*, 347 N.W.2d 416, 419 (Iowa 1984). Substantial evidence means evidence which would convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *Id.*

We find ample evidence in the record from which a jury could find that Siemer's confinement of Tracey substantially increased the risk of harm to the child and significantly lessened the risk that Siemer's infliction of chronic abuse would be detected. The record reveals that Tracey was handcuffed to his bed every day after school until the following morning and on weekends from Friday afternoon to Monday morning. While locked to his bed within feet of the furnace, the seven-year-old was frequently left alone in the house. Clearly he would have been unable to escape in case of fire or other calamity. He was unable to fulfill any of his most basic human needs such as relieving himself in a sanitary way or reaching food or water. So restrained, he was an easy target for Siemer's torture.

As for reducing the risk of detection, the evidence disclosed that the windows of Tracey's "bedroom" were boarded over and Siemer placed socks around Tracey's wrists to prevent bruising from the handcuffs. Siemer ordered April not to reveal Tracey's condition to her playmates. He exercised such abusive mind control tactics upon the victim and his sister that the secrecy of the confinement was assured. The fact that Siemer allowed Tracy to attend school actually minimized, rather than enhanced, the discovery of the confinement for it gave authorities less reason to suspect that

crime was occurring. In short, we find substantial evidence in this record to support a finding of confinement which exceeds that normally incidental to the underlying crime of child abuse. The district court properly rejected Siemer's arguments to the contrary.

### IV. Constitutionality of Iowa Rule of Criminal Procedure 16(1).

■ Following two days of juror voir dire and impaneling of the jury, Siemer moved to waive jury trial. The State did not consent to Siemer's waiver and the court, relying on Iowa Rule of Criminal Procedure 16(1) [3] ruled that Siemer was not entitled to waive a jury within ten days of trial without the State's consent. On appeal, Siemer contends that the court's enforcement of rule 16(1) represents "an unconstitutional intrusion into defendant's right to jury trial as guaranteed by Sections 9 and 10 of Article I of the Iowa Constitution." [4] The assignment of error is without merit.

The constitutional provisions upon which Siemer relies make no mention of a right to a trial by the court. In *State v. Henderson,* this court observed that "[t]he right to waive a jury trial does not establish a constitutional right to a nonjury trial." 287 N.W.2d 583, 586 (Iowa 1980). This fundamental principle follows from the United States Supreme Court's ruling in *Singer v. United States,* 380 U.S. 24, 35, 85 S.Ct. 783, 790, 13 L.Ed.2d 630, 683 (1965), in which the Court held there exists no federal constitutional impediment to conditioning the waiver of right to jury trial on the consent of the prosecuting attorney and the trial judge. As the Court

noted in *Singer,* "if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him." *Id.* at 36, 85 S.Ct. at 790, 13 L.Ed.2d at 638.

This court adopted the same analysis in *Henderson* when we held that the right to waive jury trial was personal to the defendant "unless barred from doing so by statute or rule." *Henderson,* 287 N.W.2d at 585. Although we ruled in *Henderson* that the defendant was entitled, under the rule then in effect,[5] to an absolute waiver of jury trial, the rule has been subsequently twice amended. Following this court's decision in *Henderson* the legislature amended rule 16(1) to afford an absolute right to waive only up to thirty days after arraignment and thereafter only with the consent of the State. 1981 Iowa Acts ch. 206, § 16. The rule was again amended in 1986 to condition waiver within ten days of trial upon the State's consent. 1986 Iowa Acts ch. 1106, § 1.

It is the legislature's prerogative to decide whether, and under what circumstances, the right to jury trial may be waived. *State v. Fagan,* 190 N.W.2d 800, 801 (Iowa 1971). Neither the plain language of the Iowa Constitution nor the legislative history of rule 16(1) furnishes Siemer the unconditional right to trial by the court that he seeks. The court was correct in overruling his request.

AFFIRMED.

---

**3.** The rule provides that cases shall be tried by jury unless

the defendant voluntarily and intelligently waives a jury trial in writing and on the record within thirty days after arraignment, or if no waiver is made within thirty days after arraignment the defendant may waive within ten days after the completion of discovery, but not later than ten days prior to the date set for trial, as provided in these rules for good cause shown, and after such times only with the consent of the prosecuting attorney.

**4.** Article I, §§ 9 and 10 of the Iowa Constitution provide, in pertinent part: "The right of trial by

jury shall remain inviolate; but the General Assembly may authorize trial by a jury of a less number than twelve men in inferior courts" and "[i]n all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury...."

**5.** When *Henderson* was decided rule 16(1) provided only that "[c]ases required to be tried by jury shall be so tried unless the defendant waives a jury trial in a recorded proceeding in open court." *Henderson,* 287 N.W.2d at 584.