Donna Jayne SIMMONS, Appellant,

v.

STATE OF IOWA, Appellee.

No. 93–2695.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1994.

Decided July 11, 1994.

Francis Hoyt, West Des Moines, IA, argued, for appellant.

Thomas McGrane, Des Moines, IA, argued, for appellee.

Before BOWMAN, Circuit Judge, BRIGHT and ROSS, Senior Circuit Judges.

BOWMAN, Circuit Judge.

In December 1988 Donna Jayne Simmons was convicted in Iowa state court of first-degree kidnapping, a charge that arose out of her role in the confinement and torture of her · seven-year-old son, and she was sentenced to a mandatory term of life imprisonment. She appeals the judgment of the District Court[1] denying her petition for a writ of habeas corpus, and we affirm.

1. The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

## I.

Larry Siemer, Simmons's live-in boyfriend, began to abuse Simmons's seven-year-old son Tracey in the fall of 1987. Shortly after Christmas of that year the abuse escalated, and from December 1987 to April 1988 Tracey lived in the house's darkened furnace room, handcuffed to a rusty box springs that served as his bed. The door to the room was covered with a filthy blanket and the windows were boarded. The room contained no toilet nor was Tracey released to use the bathroom. Instead he was made to lie in his own waste. Later a bucket was placed in the room so that Tracey could relieve himself without having to be freed from the handcuffs.

Siemer allowed Tracey's ten-year-old sister April to release Tracey at 6:30 a.m. each morning so that he could attend school but demanded that he be handcuffed to the bed every day after school. Tracey spent the weekends confined in the furnace room, locked to the bed. April also was instructed to feed Tracey a small amount of food each day but otherwise to ignore him. Siemer threatened to harm April or Tracey if they revealed Tracey's abuse.

The extent of further abuse that Tracey suffered at the hands of Siemer is truly ghastly. Tracey testified that Siemer beat him with a board and a belt, cut his buttocks with a knife, hung him naked from a pipe in the basement, submerged him in ice water, and poured scalding water on his lower abdomen and genitals. When Tracey finally was rescued (after being seen in the furnace room by a neighbor child whose parents called the police), he was huddled in a corner of the furnace room under a dirty blanket, shaking uncontrollably from the pain of second-degree burns to his genitals inflicted during one of the scalding episodes. At trial medical experts testified that Tracey has permanent injuries from the burns.

At no time during this period of torture did Simmons intervene on Tracey's behalf. Instead she facilitated the abuse by helping to hide physical evidence of Tracey's mistreatment. She also participated in hand-cuffing Tracey to the bed and left him alone in the dark and dirty furnace room, fully aware of the atrocities being perpetrated by Siemer.

In preparing for trial, Simmons's counsel, Peter Berger, investigated the possibility of presenting a defense based on Simmons's diminished mental capacity. To develop this defense, Berger requested Shanhe Zenian, a court-appointed clinical psychologist, to evaluate Simmons. Dr. Zenian's initial examination indicated that Simmons might have a psychological disorder, and Berger requested that Dr. Zenian continue meeting with Simmons. Berger also filed a notice with the court that he intended to present a diminished-capacity defense. Dr. Zenian eventually spent over twenty hours meeting with and testing Simmons, and he diagnosed her as having a hysteric personality disorder. He concluded, and would have testified, that because of this personality disorder Simmons could not have formulated the specific intent to commit kidnapping in the first degree. After extensive research and deliberation, Berger decided not to raise diminished capacity as a defense at trial.

Simmons was tried on an aiding-and-abetting theory and was convicted by a jury of first-degree kidnapping, which has a mandatory punishment of life imprisonment without parole under Iowa law.[2] After the Iowa Supreme Court affirmed her conviction on direct appeal, *State v. Simmons*, 454 N.W.2d 866 (Iowa 1990), Simmons sought state post-conviction relief, which was denied, and the denial was affirmed by the Iowa Court of Appeals, *Simmons v. State*, 495 N.W.2d 786 (Iowa Ct.App.1992) (unpublished). Simmons then filed a petition for a writ of habeas corpus with the District Court, arguing that she was denied effective assistance of counsel at trial, in violation of the Sixth Amendment, and that the mandatory life sentence she received is grossly disproportionate to her conduct, in violation of the Eighth Amendment. The District Court denied the petition, and Simmons appeals. We affirm the judgment of the District Court.

---

2. Larry Siemer was tried separately and also was convicted of first-degree kidnapping.

## II.

Simmons first argues that counsel's failure to raise the defense of her diminished mental capacity constitutes ineffective assistance of counsel in violation of the Sixth Amendment.[3] To succeed in her claim, Simmons must meet the familiar two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), demonstrating both that her counsel's performance was deficient and that she was prejudiced by this deficiency. To establish that her counsel's representation was deficient, Simmons must show that under the circumstances counsel's conduct violated objective standards of reasonable professional judgment. *See id.* at 690, 104 S.Ct. at 2066; *Riley v. Wyrick*, 712 F.2d 382, 385 (8th Cir.1983). Our review of counsel's representation is a "highly deferential" one. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Counsel's decisions are presumed reasonable and "strategic choices made after thorough investigation of law and facts . . . are virtually unchallengeable." *Id.* at 690, 104 S.Ct. at 2066. Finally, we must not evaluate counsel's performance with the acuity made possible by hindsight; rather, we must view events from counsel's perspective at the time of the trial. *Id.* at 689, 104 S.Ct. at 2065.

In its opinion affirming the denial of post-conviction relief, the Iowa Court of Appeals extensively sets forth Berger's conscientious efforts to establish a diminished-capacity defense, including spending at least thirty hours researching and developing the defense, meeting often with Dr. Zenian about the defense, and reading psychological journals and manuals furnished by Dr. Zenian to educate himself about Simmons's mental disorder. He also spent considerable time with Simmons explaining all aspects of the diminished-capacity defense strategy and reviewing her options.

Before trial, however, Berger decided that the costs of this defense strategy outweighed its advantages. He came to this conclusion after discovering that, in recounting her case history to Dr. Zenian, Simmons had admitted that she was present and had participated in the abuse of Tracey. He was convinced that this evidence would be brought out by the government. Further, Berger learned that when Simmons was being examined by David Cowan, a clinical social worker, she told Cowan that her attorney had advised her not to disclose everything that had happened, even though Berger had directed her to be completely truthful. Berger believed that the state would elicit this comment from Cowan at trial and that it would create the impression that Simmons was not psychologically impaired and was attempting to hide something from the jury. After several meetings with Dr. Zenian and Simmons, he decided, with Simmons's consent, not to raise the diminished-capacity defense. At the state post-conviction hearing, Berger testified that this was the hardest trial decision he ever had had to make. Waiting until the state had completed its case-in-chief to inform the trial court that he would not present a diminished-capacity defense, Berger then defended Simmons by attempting to demonstrate that Siemer alone was responsible for abusing Tracey.

Simmons's argument that Berger's strategic decision fell outside the realm of reasonable professional judgment is without merit. Berger did a thorough job of investigating the diminished-capacity defense. He then was faced with the difficult strategic choice of raising the defense, with its almost certain liabilities, or of staking Simmons's defense entirely on an attempt to shift the blame to Larry Siemer. Counsel made a carefully reasoned and supportable decision, and we decline to second-guess it. We conclude that "[c]ounsel's strategy choice was well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699, 104 S.Ct. at 2070.

---

3. As part of her argument, Simmons contends that her counsel, instead of raising the diminished capacity defense, relied on the invalid legal theory that a parent cannot be convicted of kidnapping her own child. This is a misrepresentation of the record. Although the record reflects that Berger indeed believed that, as a matter of law, a parent could not be convicted of kidnapping her own child, the trial court refused to allow Berger to argue this theory to the jury. At trial Berger defended Simmons by attempting to shift the blame for the abuse to Larry Siemer, and he argued the disallowed legal theory on appeal.

## III.

As her second ground for habeas relief, Simmons argues that the mandatory sentence of life imprisonment without parole is so disproportionate to her crime that it violates the Eighth Amendment's prohibition against cruel and unusual punishment.[4] Again we conclude that her argument is meritless.

This Court previously has determined that the Iowa law mandating a life sentence without parole for those convicted of first-degree kidnapping, although severe, is not so disproportionate as to violate the Eighth Amendment. *Hatter v. Iowa Men's Reformatory,* 932 F.2d 701, 703 (8th Cir. 1991).[5] Simmons argues, however, that the punishment is unconstitutional as applied to the circumstances surrounding her crime. The Eighth Amendment does not demand that a crime and its sentence be matched meticulously. Rather, "it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan,* 501 U.S. 957, 1001, 111 S.Ct. 2680, 2705, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (quoting *Solem v. Helm,* 463 U.S. 277, 288, 103 S.Ct. 3001, 3008, 77 L.Ed.2d 637 (1983)). Our review of a noncapital sentence to determine whether it is grossly disproportionate to the crime is a narrow one. *See id.* at 995–97, 111 S.Ct. at 2702 (Kennedy, J., concurring); *United States v. Morse,* 983 F.2d 851, 855 (8th Cir.1993).

In his concurrence in *Harmelin,* Justice Kennedy, writing for three members of the Court, points out that courts must give great deference to legislative decisions determining the amount of prison time to be imposed for particular types of crimes. *Harmelin,* 501 U.S. at 997–1000, 111 S.Ct. at 2703–04 (Kennedy, J., concurring). Justice Scalia, joined by the Chief Justice, argues that the Eighth Amendment contains no proportionality principle, and thus we infer he would maintain that legislatures have absolute discretion in crafting noncapital punishments. *Harmelin,* 501 U.S. at 986–93, 111 S.Ct. at 2696–2701. *Harmelin* therefore underscores the constitutional truism that legislatures have expansive discretion in fixing the terms of confinement that courts are to impose on those convicted of statutory crimes. The fact that many other states do not punish with life sentences criminals who have restrained and tortured children proves only that the State of Iowa has made a legislative choice to impose a sterner penalty. Thus the cases Simmons cites from states imposing less severe punishments than Iowa does for the crime of restraining and abusing a child are unpersuasive.

Furthermore, comparing Simmons's crime to the crimes committed in *Harmelin* and *Hatter,* in which both of the defendants received sentences of life imprisonment without parole, we cannot say that Simmons is any less deserving of "the second most severe penalty permitted by law." *Harmelin,* 501 U.S. at 1001, 111 S.Ct. at 2705 (Kennedy, J., concurring). Harmelin's crime was possessing 672 grams of cocaine; Hatter's that of abducting a woman at knife point and sexually assaulting her. These crimes, including Simmons's, all are properly the ob-

---

4. Simmons failed to raise this claim in her direct appeal to the Iowa Supreme Court. In its opinion affirming the denial of post-conviction relief, the Iowa Court of Appeals concluded that the argument was procedurally barred. In this habeas proceeding, however, the state failed to raise procedural bar as a defense, and it affirmatively states in its answer that "[t]he two issues were litigated in the Iowa court ... and the issues can properly be raised in this action." Respondent's Answer to Petition for Writ of Habeas Corpus at 1. The state thus has waived the defense of procedural bar as to Simmons's Eighth Amendment claim. *Lilly v. Gilmore,* 988 F.2d 783, 785 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 116 (1993).

5. In *Hatter,* our Court relied upon *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *Solem*'s proportionality analysis has been called into question by *Harmelin v. Michigan,* 501 U.S. 957, 989–91, 111 S.Ct. 2680, 2699–99, 115 L.Ed.2d 836 (1991), in which a plurality of the Court expressed a desire to overrule or to narrow severely the holding of *Solem. See United States v. Morse,* 983 F.2d 851, 855 (8th Cir. 1993) (noting that *Solem*'s holding has been weakened by *Harmelin*). We observe that, if the Iowa statute survives the more demanding proportionality analysis of *Solem,* it necessarily survives the less exacting review dictated by *Harmelin.*

jects of severe condemnation, and courts must give legislatures wide latitude in prescribing their punishments. We conclude that the Iowa mandatory sentence of life imprisonment without parole is not grossly disproportionate to Simmons's crime of aiding and abetting the restraint and torture of her seven-year-old child.

For the reasons stated, the judgment of the District Court denying Simmons's petition for a writ of habeas corpus is affirmed.

BRIGHT, Senior Circuit Judge, dissenting.

I respectfully dissent from Section II of the majority opinion which rejects the appellant's ineffective assistance of counsel claim. Although Donna Simmons' trial counsel expended a great deal of time and effort in attempting to defend this case, he utterly failed to present a defense offering a possibility of success at trial. Rather than presenting a diminished capacity defense backed by the testimony of an unbiased psychological expert, attorney Berger chose to defend Simmons by attempting to blame her live-in boyfriend, Larry Siemer, for all the abuse. This defense ignored the State's substantial evidence demonstrating Simmons' participation in, and concealment of, the confinement and torture. Further, Berger's so-called "strategy" failed to explain why Simmons, after years of uneventful parenting, suddenly became a participant in gruesome acts of child abuse.

While we view defense counsel's strategic decisions deferentially, we cannot turn a blind eye when a defendant is denied competent counsel. Attorney Berger performed deficiently by failing to present the diminished capacity defense, and his performance prejudiced Simmons' trial.

## I. BACKGROUND

Prior to meeting Larry Siemer, Donna Jayne Simmons had no criminal record, and no history of child abuse or neglect; for ten years Simmons raised her children—April and Tracey—without incident. Siemer, on the other hand, had been charged with child

endangerment and lascivious acts with a child in a separate case involving another woman's children.

Simmons and her children moved in with Siemer in June, 1987. Siemer soon began abusing Tracey, Simmons's seven-year-old son. The abuse of Tracey escalated into long-term confinement and torture. *See ante* at 1480; *see also State v. Siemer*, 454 N.W.2d 857, 858–59 (Iowa 1990), and *State v. Simmons*, 454 N.W.2d 866, 867 (Iowa 1990).

Although Donna Simmons did not initiate the confinement or abuse, she participated significantly in Tracey's torture. First, Simmons herself committed several abusive acts. She admitted to psychologist Shahe Zenian that she handcuffed Tracey on numerous occasions. Both Tracey and April testified that their mother hit Tracey with a board. Second, Simmons facilitated many of Siemer's gruesome acts. For example, Simmons ran bath water for Siemer so that he could dunk and hold Tracey's head in it. Third, Simmons never attempted to stop Siemer or to intervene on Tracey's behalf, even though Simmons had full knowledge of Siemer's acts. For example, Simmons was present when Siemer handcuffed Tracey to a ceiling water pipe and then ran a knife across his bare buttocks. Fourth, Simmons aided Siemer by keeping the abuse a secret: she furnished washcloths to prevent telltale bruising caused by the handcuffs, and provided April and Tracey with excuses to tell teachers and social workers to explain a black eye and a broken leg which Tracey suffered. *See also Simmons*, 454 N.W.2d at 867.

Berger represented Simmons at her trial for first degree kidnapping. In preparation, he considered three different defense theories: (1) diminished capacity, which would, if proven, provide a complete defense by negating the intent necessary for first degree kidnapping; (2) blaming Siemer for everything; and (3) establishing that a mother may not, as a matter of law, kidnap her own child. The trial court refused to permit Berger to argue the third theory.[1] Berger thus had to select one of the other two defenses.

---

1. The majority notes, *ante,* n. 3., that Berger believed a custodial mother could not, as a mat-

ter of law, kidnap her own child. Berger argued this point unsuccessfully on appeal. *See Sim-*

Berger thoroughly investigated a diminished capacity defense. He timely noticed his intention of utilizing this defense to the court, and had psychologist Zenian meet with Simmons on several occasions.[2] After approximately twenty hours of meetings, Zenian diagnosed Simmons with "hysterical personality disorder". App. at 16 (Dep. of Zenian). Characteristics of this disorder include a passive-submissive and dependent personality, uncertainty about oneself, wanting reassurance from other people, and low self-esteem. *Id.* Psychological tests indicated that Siemer exerted a powerful pathological influence over Simmons, who, because of her condition, "would immediately assume a role of submission, wanting direction." *Id.* at 18. Zenian described Donna as "hypersuggestible", and characterized Simmons' description of her connection to Siemer as "almost like a slave/master kind of relationship." *Id.*

Simmons' condition rendered her completely out of touch with reality. Despite all the atrocities she saw perpetrated upon Tracey, Simmons did not believe Siemer did anything wrong. She expressed surprise when police arrested Siemer. In discussions with psychologist Zenian, Simmons revealed that she did not view what occurred as confinement. Instead, she believed that the handcuffs were merely a toy, and that Tracey always had the power to escape from them. Simmons believed Tracey kept a second key in his pocket at all times which he could have used to release himself. She also believed the handcuffs were always attached loosely enough for Tracey to escape, and that Tracey himself had tightened the handcuffs on the occasions when he could not escape. Simmons also believed that Tracey, not Siemer, initiated the handcuffing. According to Simmons, Tracey asked to be placed in handcuffs as punishment, and Siemer complied to "show [him] this is not a good punishment." Tracey's and April's testimony directly contradicted Simmons' beliefs. Further, Simmons did not believe there was anything wrong with Tracey's room, the same room the Iowa Court of Appeals described as a "dark and foul-smelling dungeon." *Siemer,* 454 N.W.2d at 859. In fact, after police arrested Siemer, Simmons invited a friend to look at Tracey's room, hoping to find support for her belief that the police were blowing everything out of proportion.

While Dr. Zenian found Simmons competent to stand trial, he concluded she could not have formed the intent necessary for first degree kidnapping:

Q. (Berger) So is she capable of understanding the gravity of the incidents involving Tracy [sic]?

A. (Zenian) My opinion to that would be no.

Q. Based on your conversations with Donna, your review of the evidence, could Donna have formulated the specific intent to commit kidnapping in the first degree?

A. My opinion is that she could not have.

Q. Based on your analysis of Donna, would your opinion be that there was substantial reason to challenge each and every element of the crime of kidnapping on psychological grounds?

A. Yes.

App. at 40.

Simmons did reveal some potentially damaging information during her psychological interviews with Zenian and the State's psychological expert, David Cowan. Simmons disclosed to Zenian that on several occasions she had been present and had participated in abusing Tracey. Simmons also told Cowan that Berger advised her to disclose as little as possible to Cowan. Berger in fact told Simmons to be completely truthful with Cowan.

After consulting with Simmons and Zenian, Berger decided not to present the diminished

*mons,* 454 N.W.2d at 867 (quoting *Siemer,* 454 N.W.2d at 863) (" 'parents may not hide behind the guise of authority to escape punishment for conduct that is proscribed for all others by the kidnapping statute.' "). Berger's insistence on raising this defense also arose at least in part from his strong personal belief that a jury simply would not convict a mother of kidnapping her own child. *See* Post–Conviction Relief App. at 48, 52.

2. At oral argument on this appeal, the prosecutor acknowledged that Zenian was a state employee who had absolutely no personal interest in the outcome of this case.

capacity defense. Berger reasoned that permitting Zenian to testify would open the door to cross-examination about Simmons' statements admitting participation in the abuse. Moreover, putting Zenian on the stand would enable the State to call Cowan and elicit Simmons' statement suggesting she had been less than truthful with him. Berger concluded that the damage of the psychologists' testimony would outweigh the benefits of presenting the defense.

Berger thus opted to defend Simmons by attempting to pin all the blame on Siemer. This strategy, however, led Berger nowhere. He put in no evidence and no testimony on Simmons' behalf. The jury convicted Simmons of First Degree Kidnapping; the trial judge imposed the mandatory sentence of life imprisonment without possibility of parole.

## II. DISCUSSION

To succeed on her ineffective assistance claim, Simmons must demonstrate that Berger performed deficiently, and that the deficient performance prejudiced the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). While we view counsel's strategic decisions deferentially and attempt to avoid judging a defense attorney's actions in hindsight, *id.* at 689, 104 S.Ct. at 2065, we nonetheless must evaluate whether counsel provided "reasonably competent" legal advice. *Id.* at 687, 104 S.Ct. at 2064.

"[S]trategic choices made after thorough investigation of law and facts . . . are virtually unchallengeable." *Id.* at 690, 104 S.Ct. at 2066. However, the mere fact that an attorney must choose one defense theory from among various possibilities does not make his ultimate selection necessarily "strategic." A trial decision is genuinely "strategic" only when an attorney brings to bear reasonable *judgment* in evaluating the risks and benefits of the various choices. *Cf. Chambers v. Armontrout*, 907 F.2d 825, 833 (8th Cir.) (en banc), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990).

Here, counsel did not make a "strategic" choice. Despite his earnest efforts, attorney Berger demonstrated incompetence by concluding, unreasonably, that the risks of employing the diminished capacity defense outweighed the potential benefits. To be sure, Zenian's potential testimony contained evidence unfavorable to Simmons. Simmons' statements to Zenian admitting her participation in the abuse, however, were merely cumulative of other testimony *already in evidence* establishing the same thing.

Even more importantly, the record shows that the alternative defense—blaming Siemer—amounted to no defense at all. Berger presented *no evidence and offered no witnesses* on Simmons' behalf. The testimony of April and Tracey established Simmons' presence and participation in the abuse. Berger did not offer, and indeed could not offer, any evidence rebutting this testimony. The jury thus heard nothing to contradict the evidence that Simmons participated in and facilitated the torture and confinement.

A competent attorney would have realized that the diminished capacity defense, in spite of its drawbacks, at least had the potential to counteract the damning testimony *already offered in evidence through April and Tracey*. Had Berger presented the diminished capacity defense, the jury would have heard Zenian's conclusions that (1) Simmons suffered from "hysterical personality disorder"; (2) this clinical disorder made her submissive and easily dominated; (3) Larry Siemer had a strongly dominant personality; (4) Simmons lost touch with reality; and (5) Simmons could not have formed the intent necessary to commit the crime of first degree kidnapping. Without presenting the psychological defense, and in particular Zenian's testimony, the jury heard nothing to explain why Simmons, after years of uneventful parenting, suddenly became a participant in gruesome acts against her own child. In my view, the *only* plausible defense for Simmons was that her mental illness caused her to completely lose the capacity to differentiate right from wrong.[3] Indeed, the evidence of

---

3. "Under Iowa law, the insanity defense is available to a defendant who, at the time of the crime, was unable to distinguish between right and wrong or did not understand the nature of his act." *Brewer v. State of Iowa*, 19 F.3d 1248,

participation is consistent with and enforces the psychological opinion that her mental condition made it impossible for Simmons to understand the gravity of the incidents involving Tracey.

Because this case concerns counsel's failure to present a *valid* defense, it falls within our holding in *Chambers*, and is clearly distinguishable from *Lashley v. Armontrout*, 957 F.2d 1495 (8th Cir.1992), *rev'd on other grounds, Delo v. Lashley*, —— U.S. ——, 113 S.Ct. 1222, 122 L.Ed.2d 620 (1993). In *Chambers*, the defendant was convicted of murder and sentenced to death for shooting a man after leaving a bar. We determined, on Chambers' petition for habeas relief, that trial counsel (Hager) provided ineffective assistance by failing to interview and call at trial an eyewitness (Jones) whose testimony would have supported a self-defense theory. Hager believed, unreasonably, that Jones' eyewitness testimony was potentially more harmful than helpful to the defendant. Under the circumstances, failing to interview Jones and call him as a witness constituted ineffective assistance:

> By failing to call Jones, Hager attempted to use a defense that lacked evidentiary support. . . . By failing to call Jones, Hager ignored an unbiased, uncontradicted witness who provided evidentiary support to Chambers' only defense and whose damaging testimony was merely cumulative of several of the State's witnesses' testimony. . . .
>
> In sum, Hager's decision not to call Jones resulted in Chambers admitting that he had shot and killed Oestricker without any explanation that would support a verdict of less than capital murder and sentence of less than death. The State has not offered sufficient reason to support a conclusion that Hager's decision not to call Jones was reasonable.

*Chambers*, 907 F.2d at 831–32 (footnotes omitted).

Here, Berger's failure to call Zenian and present a diminished capacity defense resulted in counsel using a defense "that lacked evidentiary support." Berger's "strategy" 1251 (8th Cir.1994); *see* Iowa Code § 701.4

ignored the fact that Zenian's unbiased testimony would have helped establish Simmons' only real defense; it would have provided an explanation for her actions and offered the jury a way to avoid putting Simmons away for life. The parts of Zenian's proposed testimony that were potentially damaging to Simmons were cumulative of the State's other evidence and, as mentioned, supported in every way the diminished capacity defense.

In *Lashley*, the defendant claimed ineffective assistance of counsel, asserting that his defense attorney prejudicially failed to present a diminished capacity defense. Lashley claimed that he was high on drugs when he killed his foster mother by bashing her over the head with a skillet then plunging a knife into her skull. Counsel thoroughly investigated a diminished capacity defense but could find no evidence corroborating Lashley's claim that he was high on drugs the night of the murder. The only evidence counsel could find suggested Lashley was not high that night. We rejected Lashley's ineffective assistance claim, holding that "[a] defense attorney is not ineffective for not presenting an implausible theory of defense or mitigation." *Lashley*, 957 F.2d at 1498.

In Simmons' case, diminished capacity was not an implausible theory of defense. Berger's investigation revealed the validity of a diminished capacity defense.

A trial decision which, as in this case, arises from a complete lack of understanding of the nature of an important defense and the facts supporting it, does not constitute strategic decisionmaking. That sort of decisionmaking represents ineffective assistance. *Cf. Chambers*, 907 F.2d at 831. While I am cognizant of the Supreme Court's admonitions to view an attorney's strategic decisions deferentially so as not to deter attorneys from representing criminal defendants in these difficult matters, *see Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, a defendant's right to competent counsel and a reasonably sound defense strategy should not be subjugated to the principle of deference in all cases or with respect to all decisions. If convicted, Simmons faced a mandatory life sentence without possibility of parole; rea- (1993).

sonably competent counsel would not have left her defenseless.

In my view, Simmons suffered prejudice under *Strickland* because a "reasonable probability" exists that, but for counsel's errors, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694–95, 104 S.Ct. at 2068; *Chambers,* 907 F.2d at 832. Though Cowan disagreed with Zenian's conclusions about Simmons' mental condition, Simmons could well have prevailed on this issue and succeeded in establishing her diminished capacity.[4]

## III. CONCLUSION

Siemer's actions against Tracey constitute an example of severe child abuse that no psychologically normal parent would allow. Given that Simmons had been at all other times a reasonable and proper mother, her changed behavior after moving in with Siemer should have been a red flag warning of a psychological aberration to any competent lawyer. Indeed, any competent attorney working in the criminal law, in light of the circumstances, would view Simmons' conduct in terms of psychological dysfunction rather than intentional, criminal behavior.[5] Berger provided ineffective representation for Simmons by failing to present the diminished capacity defense. The result is a grossly unjust sentence of life imprisonment without possibility of parole, which even the prosecutor admits is inappropriately harsh under the

4. The jury could well have given Zenian's testimony more weight than Cowan's because Zenian spent over 20 hours with Simmons, while Cowan based his clinical opinion on a single meeting with the defendant.

5. The fact that Berger consulted Simmons and Zenian on his "strategic" choice does not make his trial decision reasonable or competent. Although an attorney owes a duty to consult regularly with his client about key trial decisions and to keep the client informed of new developments, *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064, it is the attorney's skill and knowledge which must be brought to bear on the problem of trial strategy. The record indicates that Simmons could be

circumstances. I would remand this case for a new trial.[6]

of little assistance in formulating strategy. Zenian found her totally out of touch with the reality of her prosecution. Tr. at 19–20. According to Zenian, Simmons made a sudden decision to decline a plea bargain and proceed to trial, believing she was leaving her fate "in God's hands". *Id.*

6. I do not reach the issue of whether the harsh punishment imposed in this case amounts to cruel and unusual punishment in violation of the eighth amendment. What I believe, however, is that if Simmons had received an intelligent defense, a jury probably would not have convicted her of kidnapping her own child.