STATE of Iowa, Plaintiff–Appellee,

v.

Wayne Eugene SINCLAIR,
Defendant–Appellant.

No. 99–1855.

Court of Appeals of Iowa.

Dec. 13, 2000.

Donna M. Schauer, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Karen Doland, Assistant Attorney General, Douglas Hammerand, Assistant Attorney General, and Laura Roan, Assistant Attorney General, Kevin Parker, County Attorney, for appellee.

Heard by HUITINK, P.J., and MAHAN and VAITHESWARAN, JJ.

MAHAN, Judge.

Wayne Eugene Sinclair appeals his conviction for two counts of second-degree kidnapping in violation of Iowa Code sections 710.1(1) or (2) and 710.3 (1999), attempted murder in violation of Iowa Code section 707.11, and first-degree burglary in violation of Iowa Code sections 713.1 and 713.3. He contends: (1) there was insufficient evidence to convict him of two counts of second-degree kidnapping, (2) the State did not present sufficient evidence he attempted to murder Larry Johnson, (3) the State did not present sufficient evidence he committed first-degree burglary, (4) he did not receive effective assistance of counsel, and (5) he did not voluntarily, knowingly, and intelligently waive his right to a jury. We affirm.

**Background Facts and Proceedings.** Defendant married Tammy Sinclair in 1995. Two children were born of the marriage, G.S. and K.S., ages five and three, respectively, at the time of the incident. In October 1998, a no-contact order was issued against Sinclair, ordering him to have no contact with Tammy, her relatives, or her residence in Indianola. Both parties repeatedly violated the order. With Tammy's permission, Sinclair was allowed to see the children. He spent Christmas and New Year's with Tammy and the children.

Sinclair asked Tammy if he could have the children the weekend of January 16–17, 1999. Tammy refused. On January 13, the Wednesday prior to that weekend, Sinclair went to Tammy's workplace and gave her a twenty-page letter he had written. On January 14, Sinclair consulted with a psychiatrist. The psychiatrist found Sinclair depressed and suicidal. He recommended inpatient hospitalization due to risk of self-harm. Sinclair was involuntarily admitted to the psychiatric unit of Lutheran Hospital for twenty-four hours. According to Sinclair's discharge sum-

mary, he had no suicidal or homicidal ideations and was future-oriented at the time of discharge. Sinclair called Tammy on January 15 to let her know he had been released from the psychiatric unit of Lutheran Hospital. He asked again whether he could see the children the weekend of January 16–17. Tammy told him she was undecided and would let him know the following day.

Sinclair arrived at Tammy's house with a pizza at approximately 6:00 p.m. on January 16. Sinclair and Tammy began arguing. He accused her of seeing another man. Sinclair became very angry. He was yelling and his moods were changing. As Tammy described it, "At one point one minute he would be on the floor on his knees in front of me crying. A second later, it was like looking at the devil himself." She smelled alcohol on his breath and thought he was under the influence. Sinclair later admitted to Tammy he had been drinking.

Sinclair closed all the blinds and put the chain lock on the door of the house. When Tammy went to pick up the phone to call the police, Sinclair pulled out a gun from the inside pocket of his coat. The children were crying hysterically behind Tammy on the couch. Sinclair put the gun back in his pocket and stated, "I can't believe I did that. Now I'm going to have to kill myself because I will not live the rest of my life in prison." At one point, he asked Tammy to go out into the garage with him and shoot him. Tammy asked Sinclair to leave numerous times. He refused because he was afraid Tammy would call the police. He told her he was going to put the children to bed and make love to her all night long. He ordered Tammy into the bathroom and raped her. Afterwards, he said, "I can't believe I just raped you. Did I really just rape you?"

Tammy testified she knew she had to get herself and the children out of the house in order to survive. She talked Sinclair into driving to Des Moines with her and the children so they could drop the children off at his mother's home while they sought marriage counseling. At Sinclair's mother's house, they attempted to call a counselor, but determined it would be Monday before they could contact anyone. Tammy convinced Sinclair to let her return to Indianola in exchange for allowing him to keep the children until the following day.

Tammy returned to Indianola and spent the night in her home. She called Sinclair the following morning, January 17. She described his demeanor on the phone as follows: "He sounded like he was in a lot better state of mind. He was a lot more calm. He sounded more like himself. . . . He didn't seem like he was under the influence of anything at that time." They arranged for Sinclair to bring the children home at 3:00 p.m. that afternoon. Tammy then called her aunt and explained the events of the previous night. She asked her aunt to bring her father, Kenneth Johnson, and her brother, Larry Johnson, to her house because she was afraid of what would happen when Sinclair arrived. Tammy's aunt then went to the police and reported the events of the previous night. In a written note to the police, Tammy told the officers when Sinclair would be returning with the children, described the type of car he would be driving, and provided its license plate number. She told police he had a gun.

That afternoon, officers waited along the highway for Sinclair, planning to stop him for violating the no-contact order. When he drove by, officers turned on their lights and siren and attempted to stop him. At first, Sinclair slowed down and appeared to be stopping for the officers. He proceeded, however, to lead officers on a high-speed chase through Indianola. He ran several stop signs and exceeded the speed limit. At one point, Sinclair was traveling sixty-five to seventy miles per hour in a twenty-five mile per hour zone.

Sinclair eventually led the chase past the home of Tammy's grandmother, Helen

Rupe, who lived across the street from Tammy. As he drove by, Sinclair slowed down, aimed his gun out the passenger window of his car, and shot at Larry Johnson as he stood in Rupe's front yard. The passenger window of the car shattered. Sinclair pointed the gun out the back window of his car and shot at officers as they pursued him. The officers ducked to avoid being shot. The bullet shattered the back window of Sinclair's car.

A deputy rammed his patrol car into Sinclair's car to stop him. Officers surrounded Sinclair and pointed their guns at him. Sinclair exited his car with a gun in his hand. He waved the gun around and demanded Tammy be brought to him. He said once he saw his wife he would "shoot it out" with police. He got the children out of the back seat of his car and kept them close to him. He walked toward Tammy's house with the children next to him and the gun to his head.

Sinclair hit the front door of Tammy's house with his shoulder two or three times to push it open and entered the house with the children. He called police and insisted on talking to Tammy. They spoke on the phone for six to seven hours on January 17. Sinclair remained in the house with the children in a standoff with police for four days.

On January 21, officers implemented a plan to end the standoff by allowing Sinclair to see Tammy and speak with her from a distance. Officers supplied Tammy with a bulletproof vest and accompanied her to the house. When Sinclair came out of the house with the children at his side, officers tackled him. As the officers approached, Sinclair attempted to pull a gun

out of his coat pocket. Sinclair had a gun in his hand when he was arrested.

In a trial information filed February 1, 1999, Sinclair was charged with twenty-one criminal counts.[1] In April 1999, the court granted Sinclair's pretrial motion for change of venue, changing venue from Warren County to Cerro Gordo County. On July 6, 1999, defendant filed a written waiver of jury trial and made a record of the waiver to the court. A bench trial commenced on July 27, 1999, in the Warren County District Court. On August 4, 1999, the court found Sinclair guilty, by written verdict and order, of the following: two counts of second-degree kidnapping, one count of attempted murder, one count of first-degree burglary, one count of terrorism, three counts of possession of a firearm or offensive weapon by a convicted felon, six counts of assault of a peace officer, four counts of child endangerment, and one count of eluding or attempting to elude a pursuing law enforcement vehicle. Defendant filed a motion for new trial. Evidence admitted during the hearing on defendant's motion included the deposition of trial counsel,[2] affidavits of potential defense witnesses, a letter by Gary Gronstedt, D.O., and defendant's medical records. The court denied the motion for new trial, and sentenced Sinclair to a term of incarceration not to exceed eighty-two years. Sinclair appeals.

■ **Sufficiency of the Evidence.** We review challenges to the sufficiency of the evidence for errors at law. Iowa R.App.P. 4. The standards governing a challenge to the sufficiency of the evidence are well established:

1. Kidnapping in the second degree, in violation of Iowa Code § 710.1(1) or (2) and § 710.3 (counts I and II); attempted murder, in violation of Iowa Code § 707.11 (counts III and IV); burglary in the first degree, in violation of Iowa Code §§ 713.1 and 713.3 (count V); terrorism, in violation of Iowa Code § 708.6 (count VI and VII); possession of a firearm or offensive weapon by a convicted felon, in violation of Iowa Code § 724.26 (counts VIII, IX, and X); assault on a peace

officer, in violation of Iowa Code §§ 708.1(3) and 708.3A (counts XI through XVI); child endangerment, in violation of Iowa Code §§ 726.6(1)(a) and 726.6(3) (counts XVII through XX); and eluding or attempting to elude a pursuing law enforcement vehicle in violation of Iowa Code § 321.279 (count XXI).

2. New counsel was appointed on September 17, 1999, and filed the motion for new trial.

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the state, including legitimate inferences and presumptions which may fairly and reasonably be deduced from the evidence in the record. Direct and circumstantial evidence are equally probative so long as the evidence raises "a fair inference of guilt and [does] more than create speculation, suspicion, or conjecture." It is necessary to consider all the evidence in the record and not just the evidence supporting the verdict to determine whether there is substantial evidence to support the charge. Substantial evidence means evidence which would convince a rational factfinder [sic] that the defendant is guilty beyond a reasonable doubt.

*State v. Mills*, 458 N.W.2d 395, 397 (Iowa App.1990) (quoting *State v. Wheeler*, 403 N.W.2d 58, 60 (Iowa App.1987)). In a bench trial, the court is the fact finder. *State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997). A decision in a bench trial has the same force as a jury verdict. *State v. Ross*, 512 N.W.2d 830, 832 (Iowa App. 1993). We review a trial court's findings in a jury-waived case as we would a jury verdict: If the verdict is supported by substantial evidence, we will affirm. *State v. Weaver*, 608 N.W.2d 797, 803 (Iowa 2000).

Sinclair challenges the sufficiency of the evidence to convict him of the following: second-degree kidnapping, attempted murder, and first-degree burglary. We conclude sufficient evidence existed to convict Sinclair on each of these counts.

■ *Kidnapping.* In order to find Sinclair guilty of second-degree kidnapping, the State was required to prove:

1. On or about January 17, 1999, the defendant removed/confined G.S./K.S.

2. With specific intent to use G.S./K.S. as a shield or hostage.

3. Defendant knew he did not have the authority of G.S./K.S. to do so.

4. Defendant was armed with a dangerous weapon at the time he removed/confined G.S./K.S.

Sinclair contends there was no evidence he removed or confined the children with the specific intent to use them as a shield or hostage. He also claims the State failed to show he did not have authority to have the children in his custody. We disagree.

■ Sinclair used the children as a shield from the beginning of the four-day standoff with officers. After a deputy rammed his patrol car into Sinclair's car, Sinclair exited his car with a gun in his hand. He waved the gun around, then put the gun to his head and walked to the rear passenger side of his car. He retrieved the children, keeping them close to him as he walked down the street to Tammy's house. He demanded to see Tammy and told officers he would "shoot it out" with them once he saw her. Several officers testified they felt threatened by Sinclair when he pointed a gun at them. The officers did not shoot him or otherwise respond to the threats, however, because the children were walking in close proximity to Sinclair.

Sinclair continued to use the children as a shield when he entered Tammy's house and kept the children there with him for the next four days. During the standoff with officers, Sinclair threatened to put a bullet in each child's head. The tactical team could not implement certain tactical plans normally available to it, due to the presence of the children. When the tactical team implemented its plan on January 21, Sinclair came out of the house with the children near him. When one of the children started to wander away from Sinclair, he reached out and pulled the child back in order to keep him close.

■ Sinclair had no authority to have the children in his custody. A parent's right to custody and control of a child is not absolute. *State v. Siemer*, 454 N.W.2d 857, 862 (Iowa 1990). Parents may not

hide behind the guise of authority to escape punishment for conduct that is proscribed for all others by the kidnapping statute. *Id.* at 863. Sinclair obtained "custody" of the children on January 16 by threatening Tammy with a gun. Tammy and the children left the house with Sinclair because Tammy believed it necessary for them to survive. She allowed Sinclair to keep the children because it was the only way he would let her leave his mother's apartment and return to her home in Indianola. She feared for her life if she stayed with him that night.

We conclude Sinclair used his children as a shield throughout the four-day stand-off with officers. He had no authority to do so. Substantial evidence supports Sinclair's second-degree kidnapping conviction. We affirm the district court on this issue.

■ *Attempted Murder.* In order to prove defendant guilty of attempted murder, the State was required to prove:

1. On or about January 17, 1999, the defendant shot at Larry Johnson.

2. By his acts, the defendant expected to set in motion a force or chain of events which could have caused or resulted in the death of Larry Johnson.

3. When the defendant acted, he specifically intended to cause the death of Larry Johnson.

Sinclair contends there is insufficient evidence to convict him of the attempted murder of Larry Johnson. He points to discrepancies in Larry Johnson's pretrial deposition testimony and his trial testimony. According to Sinclair, Johnson changed certain aspects of his story at trial. Sinclair claims the State's witnesses testified inconsistently as to the speed the defendant was traveling and the location of Sinclair's car when he shot at Larry.

■ Credibility questions such as the ones raised by defendant are best left to the fact finder. *See State v. Forsyth,* 547 N.W.2d 833, 837 (Iowa 1996). We find sufficient evidence in the record to convince a reasonable fact finder Sinclair attempted to murder Larry Johnson.

■ Larry Johnson testified he was standing outside his grandmother's, Helen Rupe, house when he saw Sinclair drive by while being pursued by officers. When Sinclair saw Larry, he slowed down, aimed his gun, and shot at Larry. According to Larry, Sinclair had a "revenge-type" look on his face when he slowed the car. Larry saw the passenger window of Sinclair's car shatter, and he hit the ground. Larry feared for his life when Sinclair shot at him. The bullet Sinclair shot at Larry was recovered from the front door of Rupe's house.

Anthony Chambers was standing in front of Rupe's house, and observed Sinclair aim the gun at Larry as he drove by. He testified as follows:

You know, he just didn't pull the trigger at that point. But he was aiming intentionally at the person in the yard. It wasn't just pointing it, waiving it around, he was sighting down the barrel.

Helen Rupe observed the passenger window of Sinclair's car "just peeled down like a tin can with something blowing through it." She saw Larry hit the ground when the shots were heard. "We thought he had been shot," she testified. Tammy, who watched Larry fall to the ground from across the street, yelled, "Oh, My God, he shot at Larry." Sinclair later told Tammy, "I can't believe I shot at your brother."

The testimony of these witnesses provided the fact finder with sufficient evidence to convict Sinclair of attempted murder. We affirm the trial court on this issue.

■ *Burglary.* In order to prove defendant guilty of first-degree burglary, the State was required to prove:

1. On or about January 17, 1999, the defendant broke into the home at 501 South E. Street, Indianola, Warren County, Iowa.

2. The home was an occupied structure.

3. Persons were present in the occupied structure.

4. The defendant did not have permission or authority to break into the home.

5. The defendant did so with the specific intent to commit an assault.

6. During the incident the defendant possessed a dangerous weapon.

■ By definition, first-degree burglary requires proof of entry into an occupied structure where persons are present, with the intent to commit a felony, theft, or assault and while the burglar possesses a dangerous weapon or incendiary device or inflicts bodily injury. Iowa Code § 713.3; *State v. Rubino*, 602 N.W.2d 558, 564 (Iowa 1999). Sinclair concedes he entered Tammy's home without permission or authority while in possession of a dangerous weapon. He contends, however, the State failed to satisfy its burden of proof because no persons were present when he entered the home. He also contends the State failed to prove he entered the home with the specific intent to commit an assault.

■ The element of intent in burglary is seldom susceptible to proof by direct evidence. *State v. McFarland*, 598 N.W.2d 318, 320 (Iowa App.1999) (quoting *State v. Finnel*, 515 N.W.2d 41, 43 (Iowa 1994)). Usually proof of intent will depend upon circumstantial evidence and inferences drawn from such evidence. *Id.* Intent to commit an assault may be inferred from the circumstances of the defendant's entry into the premises and his acts preceding and following entry. *Id.* at 320–21.

■ The record supports the district court's finding defendant intended to assault Tammy when he broke into her home. Sinclair led police on a high-speed chase toward Tammy's home. He apparently saw Kenneth and Tammy at the home as he drove past. He demanded to see Tammy immediately after the chase ended and he got out of his car. Once inside the house, Sinclair went on a "searching mission" to see if someone was inside. He fired the gun twice while inside the house. He urinated several times on Tammy's side of the bed. Sinclair was very angry while talking on the phone with Tammy during the standoff. He blamed her for "setting him up" by calling the police. There is sufficient evidence Sinclair intended to assault Tammy when he entered the home.

■ Burglary laws are based on the notion people should be able to feel secure in their homes. *State v. Pace*, 602 N.W.2d 764, 768 (Iowa 1999). The crime of burglary has been historically viewed as an offense against the security enjoyed in one's habitat, tied to the ancient maxim "a man's home is his castle." *Rubino*, 602 N.W.2d at 564 (quoting 3 Wharton's Criminal Law §§ 316, 325, at 223, 253 (1995)). The risk of harm to persons distinguishes the crime of first-degree burglary and elevates it in terms of proof and severity of punishment from second- or third-degree burglary. *Rubino*, 602 N.W.2d at 564.

■ Kenneth testified he and Tammy were at her house when Sinclair drove by with officers in pursuit. As he drove past, Sinclair glanced over at Tammy's house. Tammy was standing in the doorway and Kenneth was standing on the porch. Sinclair could see one or both of them as he drove past. After defendant's car went by, Tammy ran out of the house. Kenneth yelled at her to stop, and then instructed her to go across the street to her grandmother's house. Kenneth left the house and walked down the street toward defendant's car. He observed defendant walking down the street with the children near him and the gun pointed at his neck. Kenneth knew Sinclair was headed toward Tammy's house. Therefore, he returned to Tammy's house in search of a weapon. He eventually found a large hammer. Kenneth locked the front door with a deadbolt and the chain lock. As Sinclair approached, Kenneth determined "a hammer over a gun wasn't the best idea." He

headed for the back door. As Kenneth struggled to unlock the back door to exit, he heard the defendant hitting the front door in an attempt to force it open. He had the back door unlocked and partially open as Sinclair hit the front door. Kenneth went out the back door, leaving the door ajar so Sinclair would not hear him and pursue him through the backyard. Officers and other witnesses testified Sinclair hit the door two or three times before it opened, and he entered the house with the children.

Under Iowa Code section 702.13, a crime commences with the first act directed toward the commission of the crime and ends with the perpetrator's capture or elusion of pursuers. *State v. Tillman*, 514 N.W.2d 105, 109 (Iowa 1994). Entry includes breaking of the plane of the threshold of a house. *Pace*, 602 N.W.2d at 773 (defendant committed burglary when he pushed inward on the wooden door of the house after victim retreated into the house and struggled to close the door). As Sinclair approached, Kenneth no longer felt "secure" in the home. He abandoned the home in order to protect himself from Sinclair. Kenneth was still in the home when Sinclair began the process of knocking down the door. But for Kenneth locking the front door, he would have certainly been in the home when Sinclair entered. We conclude as Kenneth attempted to escape out the back door, Sinclair was in the process of breaking down the door, the first act directed toward the commission of the burglary. Sinclair should not benefit from Kenneth's ability to escape just as Sinclair made his entry into the home. We conclude Kenneth was a "person present" in the home at the time Sinclair broke into it. We affirm the district court on this issue.

**■ Ineffective Assistance of Counsel.** We review claims of ineffective assistance of counsel de novo. *State v. Brooks*, 555 N.W.2d 446, 448 (Iowa 1996). Sinclair contends his trial counsel was ineffective in the following respects: (1) for failing to investigate fully and provide notice to the court concerning defendant's diminished responsibility and defense in support thereof; (2) for failing to speak to potential witnesses and present an affirmative defense on Sinclair's behalf; and (3) in suggesting, without investigation of defendant's mental state, a waiver of jury.

■ The defendant bears the burden of demonstrating ineffective assistance of counsel. *State v. Morgan*, 559 N.W.2d 603, 612 (Iowa 1997); *Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994); *State v. Kone*, 557 N.W.2d 97, 102 (Iowa App.1996). "A defendant receives ineffective assistance of counsel when (1) the defense attorney fails in an essential duty and (2) prejudice results." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); *State v. Bugely*, 562 N.W.2d 173, 178 (Iowa 1997). An ineffective assistance of counsel claim may be disposed of if the defendant fails to prove either prong. *State v. Cook*, 565 N.W.2d 611, 614 (Iowa 1997). Our ultimate concern in claims of ineffective assistance is with the "fundamental fairness of the proceeding whose result is being challenged." *State v. Johnson*, 604 N.W.2d 669, 673 (Iowa App.1999) (quoting *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699).

■ Ordinarily we preserve claims of ineffective assistance of counsel raised on direct appeal for postconviction proceedings to allow full development of the facts surrounding counsel's conduct. *State v. Atley*, 564 N.W.2d 817, 833 (Iowa 1997). We will resolve ineffective assistance of counsel claims on direct appeal when the record is adequate to decide the issue. *State v. Arne*, 579 N.W.2d 326, 329 (Iowa 1998). In this case, a deposition of defendant's trial counsel was taken prior to the hearing on the motion for new trial. Therefore, we have an adequate record from which to decide the issue raised by defendant.

We have carefully reviewed the deposition of Sinclair's trial counsel. Trial counsel's testimony reveals a reasonable trial strategy. He made a reasonable tactical decision not to pursue a diminished responsibility defense. He explained why he decided to rest without presenting evidence on defendant's behalf. Counsel adequately explained why he and Sinclair waived a jury trial. In addition, the record reveals Sinclair's waiver of a jury trial was knowing, voluntary, and intelligent. He has shown no prejudice resulting from the waiver. We conclude trial counsel did not violate an essential duty in his representation of Sinclair. Therefore, we reject Sinclair's ineffective assistance of counsel claims in their entirety.

**Waiver of Jury Trial.** We review de novo Sinclair's claim based on his constitutional right to a jury trial. *State v. Wilkens,* 346 N.W.2d 16, 18 (Iowa 1984). We make an independent evaluation of the totality of circumstances involved. *Id.*

The waiver of a constitutional right must be a voluntary, knowing, intelligent act, done with awareness of the relevant circumstances and likely consequences. *State v. Johnson,* 318 N.W.2d 417, 426 (Iowa 1982). A written jury waiver taken in compliance with Rule of Criminal Procedure 16(1) is prima facie evidence the waiver was voluntary and intelligent. *State v. Lawrence,* 344 N.W.2d 227, 230 (Iowa 1984). When the defendant subsequently attacks its validity, he bears the burden of proving otherwise. *Id.*

Sinclair waived his right to a jury in writing, in a separate hearing before the court, and again on the record before the trial began. The court and trial counsel questioned Sinclair extensively on his decision to waive a jury trial. Sinclair has failed to meet his burden of proving an invalid waiver. He has failed to show his mental state was somehow impaired during the three instances in which he waived a jury trial. Based on the record before us, we conclude Sinclair's waiver was voluntary, knowing, and intelligent.[3]

**Conclusion.** We affirm Sinclair's convictions. We reject all ineffective assistance of counsel claims raised by Sinclair. We conclude Sinclair knowingly, voluntarily, and intelligently waived his right to a jury trial.

**AFFIRMED.**

---

3. Because we decide this issue on the merits, we need not address the State's contention Sinclair failed to preserve error on this issue.