# IN THE COURT OF APPEALS OF IOWA

No. 14-1963
Filed August 17, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOSHWA MARQUETTE TANNER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Marshall County, Timothy J. Finn, Judge.


        Joshwa Tanner appeals his judgment and sentence for willful injury causing serious injury and domestic abuse assault causing serious injury. **JUDGMENT AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED.**


        Mark C. Smith, State Appellate Defender, and Stephan J. Japuntich, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Sharon K. Hall and Kevin R. Cmelik, Assistant Attorneys General, for appellee.


        Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Joshwa Marquette Tanner appeals the district court's judgment and sentence finding him guilty of willful injury causing serious injury and domestic abuse assault causing serious injury. Tanner argues there is not substantial evidence to support the district court's finding that he was in a domestic relationship with J.R., or that he had the requisite intent to commit the crimes. He also claims the district court erred in assessing fees and other financial obligations to him without making a determination of his reasonable ability to pay. We find there was sufficient evidence to support the convictions but an inadequate record to show whether the district court reasonably exercised its discretion when it assessed Tanner's reasonable ability to pay before assigning fees. Accordingly, we affirm the district court's judgment, vacate the sentence in part, and remand.

## I. Background Facts and Proceedings

On May 24, 2014, J.R. suffered the following injuries in a car in Marshalltown: an extensive soft tissue swelling along with subcutaneous gas and hematoma within the soft tissue of the left part of her face, a comminuted and displaced fracture involving the posterior wall of the left maxillary sinus, a herniation of fat in the left maxillary sinus, blood products within the left maxillary sinus, fractures involving the orbital floor, mandibular fractures, slight irregularity to the nasal bone (that may represent a fracture), likely blood products and gas in the nasal passage, gas lucencies in the left optic canal, and fractures of the pterygoid processes. Essentially J.R.'s jaw was broken on both sides, her left orbit—or the bone surrounding her left eye—was fractured, her left sinus was

fractured, the pterygoid processes were fractured, and her nose was fractured.[1] She had three separate hemorrhagic contusions to her brain. An emergency room doctor testified these injuries created a substantial risk of death had J.R. not received treatment in a hospital.

Both parties concede Tanner, J.R.'s boyfriend at the time of the incident, caused her injuries. The night before the incident, Tanner and J.R. got into a verbal disagreement that ended with J.R. telling Tanner she was going to her sister's house and did not know when she would be home. Tanner called J.R. multiple times during the night; when J.R. finally answered, she sounded drunk and asked Tanner, "Why would I come home?"

Early the next morning, Tanner called his cousin and asked him to look for J.R. at her friend's house. Tanner's cousin located J.R. at her friend's home and told Tanner he could not wake her. Tanner got a ride to Marshalltown and walked to J.R.'s friend's house. When he arrived, he saw beer cans and cigarettes in J.R.'s car, neither of which were brands he knew she used. Tanner retrieved J.R.—who was sleeping on the couch—and walked her out to her car.

In the car, Tanner asked J.R. about the beer and cigarettes and said he could "smell her," to which she replied "no, you can't smell me." When she told him, "I'm not going to be fucking scared of you today," he hit her twice in the jaw. Tanner immediately drove J.R. to the emergency room after seeing she was bleeding and making strange noises.

---

[1] In his brief, Tanner adopted the descriptions of J.R.'s injuries from the district court's written ruling; we do the same.

When asked by a nurse about what happened, Tanner said, "I did it. I hit her." Officer Joe Hengeveld described Tanner as "very agitated" and "sweaty." More than once Tanner said, "I really screwed up." Tanner said J.R. was his girlfriend and they lived together in Toledo. Tanner admitted to punching J.R. in the face twice and then driving her to the emergency room.

Detective Sadie Weekley, who interviewed Tanner at the hospital, testified as follows at trial:

> Q: Did Mr. Tanner tell you whether he told anyone at the ER how [J.R.] had been injured? A: Yes. He stated that he told a worker there, "That's my fault. I assaulted her."
> . . . .
> Q: Did Mr. Tanner acknowledge or state to you that what he did to [J.R.] was wrong? A: Yes.
> Q: Did Mr. Tanner make any statements indicating that he placed some of the blame on [J.R.] for what happened? A: Yes. He said that she's always provoking him into hitting her and she had given him a disgusted look right before this had happened.
> Q: Did you ask Mr. Tanner if he meant to hurt [J.R.]? A: Yes, I did.
> Q: What did he say? A: He said that he didn't mean to hurt her that bad. That he was just getting her to shut up.
> Q: Did Mr. Tanner make any statements in your interview indicating that he was concerned for [J.R.] or for her condition? A: No.
> Q: Did Mr. Tanner express any concern for what would happen to him if [J.R.] died? A: Yes. He asked how serious it would be for him if she didn't make it.
> Q: Did Mr. Tanner state whether [J.R.] had expressed any fear of him? A: He said that two days prior to this incident, she asked him if he was going to kill her.

Detective Weekley also testified Tanner demonstrated how he struck J.R., showing a closed fist and landing two punches to the left side of her face. Tanner, who testified in his own defense, denied having any intent to harm J.R.:

> Q: When you got in the car, did you intend to assault her? A: No.

Q: Did it just kind of happen?  A: Yeah.  It happened spur of the moment.

THE COURT: I'm sorry. I didn't hear that.

A: It happened spur of the moment.  I didn't intend for it.

On cross-examination, Tanner admitted he was "pissed off" at J.R. and suspected she had been engaged in sexual relations with someone else.

Q: So you basically questioned everything that she said to you?  A: Pretty much.

Q: Your anger at [J.R.] was building up when you were in the car with her?  A: I wasn't angry with [J.R.].

Q: You told Detective Weekley that you were angry with her, though; didn't you?  A: I might have told her that I was pissed off but I wasn't angry.

Q: So you were pissed off at her?  A: Was a little pissed, yes.

Q: And you felt that way in the car?  A: Not really.  Once I got in the car, it was okay.  You know, we was driving—we were driving off and we were heading home; and once I started trying to talk to her, I mean, it wasn't really a conversation; and it just happened.

Q: It was in the car that you had the conversation about the Busch Light and the Kools?  A: Yes.

Q: And you smelled [J.R.] in the car, correct?  A: Yes.

Q: You smelled her vagina?  A: Yes.

Q: And so you're concerned at the time that perhaps she had had sexual relations with another man?  A: I couldn't—I couldn't really just say that, you know.  I just know that there was something different.  So I don't know what she had been doing.  So I couldn't say she was with another man.  She could have been with another woman.

Q: But that thought crossed your mind in the car?  A: It would cross any man's mind.

Q: So that's a yes?  A: Yeah.

When asked about past physical altercations, Tanner admitted pushing J.R. down in the snow one day and knocking her out.  Tanner also recalled J.R. had a scar on her head from a time when he pushed her against the wall of their home.

Tanner entered a plea of not guilty based primarily on his contention he did not intend to injure J.R. that severely. On August 26, the matter was tried to the bench; on October 9, the district court issued a guilty verdict. The court sentenced Tanner to ten years in prison for willful injury and two years for domestic assault, to be served consecutively. He was also ordered to pay $264.50 in attorney fees and $251.18 to the Crime Victim Compensation Program. The sentencing order indicated "costs and fees are due immediately and shall be considered delinquent if not paid within [thirty] days of today's date." Tanner appeals.

## II.     Scope and Standard of Review

Sufficiency-of-the-evidence claims are reviewed for errors at law. *State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997). "[T]he trial court's factual findings are binding on appeal if supported by substantial evidence." *State v. Taylor*, 689 N.W.2d 116, 130 (Iowa 2004). Substantial evidence is evidence that could convince a rational trier of fact of the defendant's guilt beyond a reasonable doubt. *State v. Torres*, 495 N.W.2d 678, 681 (Iowa 1993). We review the evidence in the light most favorable to the State to determine if there is substantial evidence. *State v. Sutton*, 636 N.W.2d 107, 110 (Iowa 2001).

We review the district court's grant or denial of attorney fees for an abuse of discretion. *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 469 (Iowa 2010). "An abuse of discretion will only be found when a court acts on grounds clearly untenable or to an extent clearly unreasonable." *State v. Hopkins*, 860 N.W.2d 550, 553 (Iowa 2015) (citation omitted).

### III.    Analysis[2]

### A.    Willful-Injury Charge

Tanner argues the record does not include evidence supporting inferences he acted with the specific intent to cause serious injury, as required for a conviction of willful injury causing serious injury.  *See* Iowa Code § 708.4(1) (2013) (defining willful injury causing serious injury as "an act which is not justified and which is intended to cause serious injury to another" that "causes serious injury to another").

The element of intent is seldom susceptible to proof by direct evidence. *State v. Sinclair*, 622 N.W.2d 772, 780 (Iowa Ct. App. 2000).  Proving intent usually depends on circumstantial evidence and the inferences a fact-finder may draw from the evidence.  *Id.*  "[T]he facts and circumstances surrounding the act, as well as any reasonable inferences to be drawn from those facts and circumstances, may be relied upon to ascertain the defendant's intent."  *State v. Schminkey*, 597 N.W.2d 785, 789 (Iowa 1999).

Tanner claims he lacked the specific intent to cause J.R.'s serious injuries. Tanner admitted to previously assaulting J.R. at least twice.  Tanner blamed J.R. for "always provoking him into hitting her," indicating "she had given him a disgusted look right before this had happened."  Tanner expressed no concerns to officers for her condition and admitted to officers she feared he would kill her. He told the officers, hospital employees, and his cousin he had "messed up."

---

[2] Insofar as the State challenges Tanner's preservation of these issues on appeal, we assume, without deciding, that they were preserved.  Because we consider Tanner's arguments on the merits, we need not consider Tanner's alternative claim that his counsel was ineffective for failing to preserve these issues.

Tanner conceded he was "a little pissed" at J.R. and questioned who she had been with that night, alluding that he did not trust her. He physically demonstrated striking J.R., showing how he used a closed fist and landed two punches to the left side of her face and jaw with his right hand.

The medical and physical evidence shows J.R. suffered extensive injuries and ongoing problems resulting from the forceful blows Tanner inflicted upon her face and head. An emergency room doctor testified the amount of force required to fracture a jaw in multiple places is "quite a bit." She opined Tanner may have inflicted more than two punches, or J.R.'s head may have struck the window or another hard surface of the car, resulting in three brain contusions and multiple bone fractures. Additionally, Tanner was focused on his own legal predicament and was not personally concerned about J.R.'s serious condition.

After considering the record as a whole, we find there was substantial evidence Tanner acted with the specific intent to seriously injure J.R..

### B.      Domestic Abuse Charge

Tanner makes two challenges to his conviction for domestic abuse assault with intent to inflict serious injury: (1) there is not substantial evidence to support he had the requisite specific intent, and (2) there is not substantial evidence to support the district court's finding he was in a domestic relationship with J.R.. For the reasons discussed above, Tanner's first challenge fails. *Compare* Iowa Code § 708.4(1) (defining willful injury causing serious injury as requiring "intent[] to cause serious injury to another"), *with id.* § 708.2A(2)(c) (defining domestic abuse assault as requiring "intent to inflict a serious injury upon another").

With regard to the domestic-relationship claim, J.R. testified at trial that she and Tanner had lived together since September 2013 and had a sexual relationship. Tanner told Officer Hengeveld he and J.R. "lived together in Toledo," and he told Detective Weekley they had lived together since September. We find there is substantial evidence of record to support the district court's finding that Tanner and J.R. were in a domestic relationship.

### C. Attorney Fees

Tanner claims the district court's order to pay court-appointed attorney fees and victim compensation was deficient because the court failed to consider his reasonable ability to pay. At sentencing, the court ordered Tanner to pay $251.18 to the Crime Victim Compensation Program and $264.50 in appointed defense attorney certified fees. The sentencing order stated "costs and fees are due immediately and shall be considered delinquent if not paid within [thirty] days of today's date."

In this case, the sentencing order contained the plan of restitution—the total amount of restitution owed by Tanner to the Crime Victim Compensation Program and his attorney. The district court's inclusion of an established due date—"costs and fees are due immediately and shall be considered delinquent if not paid within [thirty] days of today's date"—constituted a restitution plan of payment. It was proper for Tanner to raise the issue on direct appeal because, when the plan of restitution and restitution plan of payment are part of a sentencing order, a defendant has the right to direct appeal. *State v. Kurtz*, 878 N.W.2d 469, 472 (Iowa Ct. App. 2016). "We conclude [Tanner] is able to appeal the restitution order, including the court's failure to consider his ability to pay,

because the plan of restitution and the restitution plan of payment were part of the sentencing order from which [Tanner] had a right of appeal." *See id.* (citing *State v. Janz*, 358 N.W.2d 547, 549 (Iowa 1984)).

Generally, "restitution ordered to the victim is made without regard to the defendant's ability to pay." *State v. Wagner*, 484 N.W.2d 212, 215-16 (Iowa Ct. App. 1992); *see also* Iowa Code § 910.2(1). "However, restitution is ordered for crime victim assistance reimbursement, for public agencies, for court costs including correctional fees, for court-appointed attorney fees, for contribution to a local anticrime organization, and for the medical assistance program only to the extent the defendant is reasonably able to pay." *Kurtz*, 878 N.W.2d at 472 (citing Iowa Code § 910.2(1)). "Constitutionally, a court must determine a criminal defendant's ability to pay before entering an order requiring such defendant to pay criminal restitution pursuant to Iowa Code section 910.2." *Goodrich v. State*, 608 N.W.2d 774, 776 (Iowa 2000). "A defendant who seeks to upset a restitution order, however, has the burden to demonstrate either the failure of the court to exercise discretion or an abuse of that discretion." *State v. Van Hoff*, 415 N.W.2d 647, 648 (Iowa 1987).

"Thus, before ordering payment for court-appointed attorney fees and court costs, the court must consider the defendant's ability to pay." *Kurtz*, 878 N.W.2d at 473. In this case, we agree with Tanner the record does not reveal the court considered whether Tanner was able to pay the aforementioned fees.[3]

---

[3] Tanner argues his affidavit of financial status revealed he had no ability to pay; but while his first affidavit indicated he was employed prior to his incarceration, the presentence investigation report contains a limited employment history and limited

Because we cannot determine whether the court reasonably exercised its discretion when it ordered restitution for attorney fees and victim compensation, we vacate that portion of the sentence and remand for a determination of Tanner's reasonable ability to pay.

**JUDGMENT AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED.**

---

information directed at ability to pay. We will not speculate as to what conclusions the district court may have drawn from the limited information in the record.

We note, however, at the sentencing hearing, Tanner offered no argument or evidence relating to ability to pay. Defense counsel stated reasons to seek suspending the fines, but offered no argument seeking relief from restitution. In his allocution, Tanner made no such plea either. Our case law has relaxed preservation-of-error rules regarding appealing an abuse of discretion on sentencing issues. *See, e.g., State v. Lathrop*, 781 N.W.2d 288, 293 (Iowa 2010) (concluding "errors in sentencing may be challenged on direct appeal even in the absence of an objection in the district court"). We question whether that relaxed standard should allow a defendant to fail to present facts on an issue that requires the court to consider certain facts in the exercise of its discretion, then complain on appeal the court failed to consider facts the defendant failed to present.