## IN THE COURT OF APPEALS OF IOWA

No. 22-1370
Filed December 6, 2023

**CHRISTOPHER LEE KING,**
 Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
 Respondent-Appellee.
_____

 Appeal from the Iowa District Court for Des Moines County, John M. Wright,

Judge.

 Christopher King appeals the denial of his application for postconviction

relief. **AFFIRMED.**

 Alfredo Parrish and Jessica Donels of Parrish, Kruidenier, Dunn, Gentry,

Brown, Bergmann & Messamer, L.L.P., Des Moines, for appellant.

 Brenna Bird, Attorney General, and Kyle Hanson (until withdrawal) and

Sheryl Soich, Assistant Attorneys General, for appellee State.

 Heard by Tabor, P.J., Badding, J., and Gamble, S.J.*

 *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**BADDING, Judge.**

Christopher King, a former city council member turned photographer, was convicted by a jury of sex crimes against four of his teenage clients.[1] We affirmed his convictions on direct appeal, preserving a narrow ineffective-assistance-of-counsel claim for postconviction relief. *See State v. King*, No. 16-1615, 2017 WL 6039990, at *1, *6 (Iowa Ct. App. Dec. 6, 2017). King pursued that relief, which the district court denied on exhibits and briefing from the parties.

On appeal from the denial of his application for postconviction relief, King contends the court erred in rejecting his claims that trial counsel was ineffective for (1) failing to renew a motion for change of venue; (2) failing "to preserve error when his motion[s] to strike problematic jurors were wrongly denied," and (3) eliciting inadmissible vouching testimony.[2]

To succeed with these claims, which we review de novo, King had to show (1) deficient performance and (2) prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021). We "may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief." *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017) (citation omitted). "Our ultimate concern is with 'the fundamental fairness of the proceeding whose result is being challenged.'" *State v. Risdal*, 404 N.W.2d 130, 141 (Iowa 1987) (quoting *Strickland*, 466 U.S. at 696).

---

[1] The jury found King guilty of two counts of sex abuse in the third degree, a lesser offense of assault with intent to commit sexual abuse, and penetration of genitalia with an object. He was acquitted of dissemination and exhibition of obscene material to a minor and indecent exposure.

[2] The only claim raised on direct appeal was the vouching claim, which is the one that we preserved for postconviction relief. *King*, 2017 WL 6039990, at *6.

**I.    Venue**

In the wake of his arrest in May 2015, newspaper headlines in King's hometown read: "Former city councilman faces sex charges," "Court papers: King admits to molesting girls," and "Molestation inquiry expands to adjoining states." As the media reports continued, King moved to change venue in July, arguing "that public condemnation . . . has reached a fever pitch," with misleading information from these outlets saturating the county.  The State resisted, and a hearing was held in August.  The district court denied the motion for change of venue, concluding "the nature, tone, and accuracy of the articles" and their timing in comparison to the trial "do not support a finding that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from Des Moines County."  *See* Iowa R. Crim. P. 2.11(10)(b).[3]  The court also noted that, because jury selection had yet to occur, it was without evidence on whether the media exposure would compromise the impartiality of the potential jury pool.

King was appointed new counsel in February 2016, who made a second motion to change venue in July.  The basis for that motion was a recently published newspaper article quoting the court's denial of King's motion to adjudicate law points: "'The defendant does not dispute he rubbed the described area of (her) body with his fingers,' [the court] wrote in denying [the] motion.  'The court concludes the contact as alleged in count one . . . is contact as used in the definition of a sex act.'"  King argued publication of that ruling was "extremely prejudicial," "completely tainted the jury pool," and made "it absolutely impossible

---

[3] This rule has been renumbered to 2.11(11).

for [him] to have a fair trial in Des Moines County." The court disagreed, finding King did not establish actual or presumed prejudice:

> At this point in time, it is mere guesswork whether or not members of the jury panel have read this particular newspaper article, and if so, what impact the article might have on the ability of the potential jurors to be fair and impartial. This issue can be explored during careful voir dire, which will be reported. During voir dire, if it appears that Defendant cannot receive a fair and impartial trial in Des Moines County, Defendant may renew his motion.

King's trial started in August. Toward the beginning of jury selection, the prosecutor asked potential jurors to raise their hands if they had seen or heard anything about the case in the newspaper or on the radio. Most of the thirty-three initial potential jurors raised their hands—only eight did not. King claims that because his attorney did not renew the motion to change venue at that point, he "was tried by a biased jury." Relying on *State v. Robinson*, he argues: "When pretrial publicity is so pervasive, it cannot be cured by extensive voir dire." 389 N.W.2d 401, 403 (Iowa 1986). The district court rejected this argument, as do we.

To successfully change venue, King would have needed to prove either (1) the "publicity attending his case was so pervasive and inflammatory that prejudice must be presumed, or (2) actual prejudice on the part of the jury." *State v. Siemer*, 454 N.W.2d 857, 860 (Iowa 1990); *see also State v. Tompkins*, 859 N.W.2d 631, 637 (Iowa 2015) ("[W]here a claimant alleges counsel's failure to pursue a particular course breached an essential duty, there is no such duty when the suggested course would have been meritless."). Forgoing a claim of actual prejudice, King likens his case to *Robinson*, in which the court found: "There was a barrage of unmistakable warning signals that few people had an open mind on the questions of defendant's guilt. Nearly everyone on the jury panel had heard or

read about the case and many were acquainted with the prosecution witnesses." 389 N.W.2d at 403.

"Whether publicity rises to the level of being presumptively prejudicial depends on the following factors: the nature, tone, and accuracy of the articles; their timing in relation to the trial; and the impact of the publicity on the jurors as revealed through voir dire." *Siemer*, 454 N.W.2d at 860. King does not really address the first two factors, focusing instead on the potential jurors' exposure to the media accounts—most of which were published more than a year before trial. *See id.* at 861 (stating the "passage of time abated the barrage of media coverage which occurred when the story first broke"). But to determine "juror prejudice, the relevant question is not what a juror has been exposed to, but whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant." *State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985); *accord Siemer*, 454 N.W.2d at 861 ("[M]ere exposure to news accounts will not create a presumption of prejudice.").

The jurors who knew about the case from media accounts and could not set aside preconceived opinions about King's guilt were stricken for cause. *See Siemer*, 454 N.W.2d at 861 (considering the court's "abundant caution in dismissing for cause the venire persons who held negative attitudes toward the crime, generally, or against Siemer, particularly"). Those that remained agreed with the prosecutor that you can't believe everything you read in the newspaper, see on television, or come across on social media, and that they could decide the case based only upon the evidence they heard at trial. *See State v. Walters*, 426

N.W.2d 136, 138 (Iowa 1988) ("Impartiality does not demand complete juror ignorance of issues and events.").

So while King's trial counsel testified that his concerns with pretrial publicity "all came true," he still felt voir dire went "pretty well for the most part," which led him to believe "we were gonna get a fair jury." *See Fryer v. State*, 325 N.W.2d 400, 413 (Iowa 1982) ("The question of when to seek a change of venue is, however, a matter of professional judgment about which experienced trial lawyers frequently disagree."); *accord Karasek v. State*, 310 N.W.2d 190, 191 (Iowa 1981) (holding counsel's failure to ask for a change of venue does "not reflect on competency" or "indicate ineffectiveness"). King challenges that conclusion not by pointing to jurors who were prejudiced by pretrial publicity, but by highlighting ones who knew the parties or witnesses or had been affected by sexual abuse. We agree with the State that those prejudices were properly explored through voir dire,[4] as will be discussed in more detail below. *See State v. Ware*, 338 N.W.2d 707, 713 (Iowa 1983) ("Voir dire of prospective jurors should be trusted to expose any substantial prejudices among the jurors." (citation omitted)).

For these reasons, we conclude counsel's failure to renew the twice-denied motion for change of venue was not a breach of an essential duty and affirm the district court on this point.

---

[4] The record shows that five jurors were struck for cause because of their prior experiences relating to sexual abuse. One of those five also had a connection to some of the potential witnesses. Defense counsel challenged another juror for cause, which we detail in the next section, because King had taken her daughter's senior pictures in 2012. That challenge was denied, so defense counsel used a peremptory strike to excuse her from the jury. Counsel used some of his other strikes on a juror who knew the prosecutor, another who knew one of the victims, and one who was a victim of sexual abuse herself.

## B.     Challenges for Cause and Peremptory Strikes

King's next claim also strikes at the jury, but from a different angle.  Two of his challenges for cause were denied by the trial court.  The first was for Juror 13, who said that she knew King because he took her daughter's senior pictures in 2012.  During an individual session, she equivocated on whether she could keep an open mind, stating that while it "would probably be hard," she "would try."  While she "got along well with" King and "wouldn't want it to be true," she thought "there's enough people that have come forward" that she "couldn't rule it out one way or the other."  The court denied King's challenge because she conveyed "that she could base her verdict on the evidence."

Later on during voir dire, Juror 13 volunteered a new concern that she wanted to discuss privately.  Back in chambers, the juror explained that she was worried about picturing her daughter "up there and this happening to her, how it would make me feel and how I would, you know, take that into consideration."  Defense counsel renewed his challenge, arguing: "She felt compelled in the courtroom to bring us all back here to let us know that she had some serious concerns about being able to fairly and impartially hear the evidence in this case and make a decision based solely on that."  The court denied the challenge again, finding the "juror has not expressed an opinion that she has decided the defendant is guilty or innocent."  So King used a peremptory strike to remove this juror.

The second juror that King unsuccessfully challenged for cause was Juror 10.  She did not know the parties or witnesses and had not been exposed to any pretrial publicity.  But she had been a victim of sexual abuse more than thirty years ago.  The juror did not, however, believe that would affect her ability to serve

as a juror because "it was so long ago," she got "help for it," and "c[a]me to terms with what happened." Defense counsel challenged Juror 10 for cause, asserting that because "she was a victim of sexual abuse herself, I think there is a bias inherent to that." The court denied the challenge, and King used another peremptory strike on her.

Following the denial of these for-cause challenges and the exhaustion of King's peremptory strikes, defense counsel did not ask for an additional strike to be used on a particular juror. *See State v. Jonas*, 904 N.W.2d 566, 583–84 (Iowa 2017) (holding prejudice will be presumed from improper denial of a challenge for cause if the defendant specifically asks the court for an additional strike of a particular juror after his peremptory strikes have been exhausted).[5] King claims this was ineffective assistance, arguing that he "was tried by a biased jury because his trial counsel failed to preserve error when his motion[s] to strike problematic jurors were wrongly denied."

Because this is not a direct appeal, but a "collateral attack on the defendant's conviction via a claim of ineffective assistance," King must establish *Strickland* prejudice. *Dixon v. State*, No. 16-2195, 2018 WL 3471833, at *7 (Iowa Ct. App. July 18, 2018). "This generally requires the defendant to prove 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (citation omitted). But in *Dixon*, this court held that in the context of improperly denied challenges for cause, "a postconviction claimant establishes an entitlement to relief upon showing an

---

[5] This procedure is now codified in Iowa Rule of Criminal Procedure 2.18(11), effective July 1, 2023.

actually biased juror served on the jury." *Id.*; *cf. Powell v. State*, No. 18-0542, 2019 WL 2524264, at *8 (Iowa Ct. App. June 19, 2019) (finding defendant "could not establish constitutional or *Strickland* prejudice" because "the biased juror was removed").

King claims the actually biased juror who served on the jury—and the one his trial attorney should have identified as the juror he would have stricken if another strike had been available—was Juror 18. During individual voir dire, this juror said his children were alleged victims of sexual abuse two years before King's trial. It was investigated "and they really didn't find anything in the case, but it was quite a scare to the family." The juror explained that he did "have concerns whether [he] might be biased" or "judge too harshly" "as far as being a parent and seeing a child go through this." Yet he agreed that he had not formed an opinion because he hadn't "heard any evidence to sway [his] opinion one way or the other." The juror, who had not seen any news accounts, also agreed that he was "willing to listen to the evidence presented in court and make a decision solely on that." King did not challenge this juror for cause or use a peremptory strike on him.

Assuming without deciding that the two jurors King challenged for cause should have been disqualified, we do not agree that Juror 18 was actually biased. *Cf. Dixon*, 2018 WL 3471833, at *8 ("Juror M.H. never wavered from his view that Dixon was guilty unless proved otherwise. This is actual bias."). "Familiarity with the trial topic is different from a bias against the defendant or a preconceived view of his guilt." *State v. Doorenbos*, No. 19-1257, 2020 WL 3264408, at *7 (Iowa Ct. App. June 17, 2020). While this juror's children had been potential victims of sexual abuse, he did not express a bias against King or a fixed opinion on the

merits of the case. "Actual juror bias occurs when the evidence shows that a juror, in fact, is unable to lay aside prejudices and judge a case fairly on the merits." *State v. Webster*, 865 N.W.2d 223, 236 (Iowa 2015). Here, the record shows Juror 18 was able to "lay aside his impression or opinion and render a verdict based on the evidence presented in court," which is sufficient. *Walters*, 426 N.W.2d at 139. Because an actually biased juror did not serve on King's jury, we affirm the district court's denial of this claim on prejudice grounds.

### C.     Vouching

This leaves us with King's final claim—that trial counsel was ineffective for inadvertently eliciting inadmissible vouching evidence on cross-examination of the State's expert witness, Karla Miller. The district court rejected this claim, finding King did not show "a reasonable likelihood that the outcome of his case would have been different absent the disputed testimony." We agree.

Miller is a trauma therapist, licensed independent social worker, and retired rape victim advocate. On direct examination, Miller testified that most victims never report a sexual assault for various reasons, including shame, "shock, disbelief, denial," and fear. She explained that in her experience, victims also tend to minimize the assault in their minds because of "a natural tendency to want to deny it and push it away and to make it not as bad as it is." And when this minimization happens, Miller testified "those memories can be repressed, or parts of those memories. It can also affect the memory in terms of whether they encode something in the first place." She also explained that memories will be affected if alcohol or drugs are involved. As to repressed memories, Miller testified that if victims remember them later, that "doesn't at all" mean they are false memories.

Hearing what he believed were a lot of "absolutes or certainties" from Miller's testimony, defense counsel asked on cross-examination, "[Y]ou are trained not to question your clients' reality; correct?" Miller answered, "We're trained to believe the victim . . . unless we have a reason not to." The challenged exchange then occurred:

> Q. *So do you believe false reporting is not possible then?* A. What I believe is that if someone—first, if I thought that someone was fabricating something for some reason, I would deal with that directly. Secondly, if someone were not truthful about a situation, it would be—it would come to light long before—before it would get to me.
> Q. How do you figure? A. Well, like I said, if somebody reported, and they were within the system, it would be investigated. There would have to be corroboration. There would have to be— and, usually, if somebody has done that, you find out pretty quickly. If it's—let's say, for example, it's somebody who had sex with somebody, woke up the next morning, and—and it was bad—you know, it was just bad, a bad experience, you're not likely to go tell people about that, and, I mean, that's an embarrassing thing, right. I mean, that's just something that I agreed to do this and it was stupid and whatever. *Do I believe that victims report—falsely report? I don't by and large.* Could somebody—I would say that if for some reason someone was trying to get somebody into trouble, I would pick up on that.

(Emphasis added.)[6]

---

[6] On direct appeal, we also highlighted Miller's testimony on redirect that in "'the FBI uniform crime report . . . [sexual offense false reports occur] no more than any other crime and is sometimes less' and sexual crimes are 'vastly underreported.'" *King*, 2017 WL 6039990, at *6. The argument sections of King's briefs do not mention or complain about this testimony, focusing instead on what defense counsel elicited on cross-examination. We will do the same, although our prejudice analysis extends to this limited, non-specific testimony as well. *Cf. State v. Pitsenbarger*, No. 14-0060, 2015 WL 1815989, at *8 n.4 (Iowa Ct. App. Apr. 22, 2015) (discussing expert testimony relying on specific statistics, including "72 to 100 percent of kids do not disclose abuse; only 11 percent of children actively disclose at first opportunity; 53 percent of mothers are not protective of children after they disclose; 65 percent of mothers are not supportive of a disclosing child; and only 5 percent of children who allege sexual abuse make false allegations").

King claims the verdicts were "tainted by [this] inadmissible vouching evidence, which was elicited by [his] own counsel." He asserts the court erred in finding he was not prejudiced by the testimony, arguing this was a case of credibility and Miller's testimony "that false reporting of sex abuse crimes does not occur" tipped the scales in the State's favor.

In support of his argument, King likens this case to our decision in *Simpson v. State*, No. 15-1529, 2017 WL 1735615 (Iowa Ct. App. May, 3, 2017). But, in *Simpson*, trial counsel was found ineffective for failing to object to expert testimony on hypothetical facts that "mirrored the narratives" of the two victims, as well as testimony about "a 'core of truth' in victims' testimony and efforts to coach victims to tell false stories"—basically that the victims "would be unable to sustain a false story over time or, in other words, lie." 2017 WL 1735615, at *2–7. Viewed in totality, those statements "crossed the line," so counsel had a duty to object. *Id.* at *7. On prejudice, while the evidence was overwhelming, the court found the expert's "assertion that adolescents were essentially incapable of perpetuating falsehoods amounted to a comment on these teens' credibility and generated a reasonable probability that the outcome would have been different had counsel objected and had the court sustained the objection." *Id.* at *8.

Here, four victims testified to similar encounters with King. All of them met King through his photography business, Daisy Frames. After having their pictures taken by the business, they were each offered employment to pay down their balance. Each victim's so-called employment involved King driving them around in his car, supplying alcohol, talking about sex, and playing sexually themed games like "Never Have I Ever" or "strip Truth or Dare." These grooming behaviors led to

King engaging in the acts that formed the charges against him and resulting convictions he is now challenging.

Unlike *Simpson*, there were no mirrored hypotheticals or testimony that essentially said these victims could not be lying. Miller testified that she did not interview any of the victims in this case, and her opinion left open the possibility that victims might lie to get others in trouble. Further, the expert testimony in *Simpson* was extensive while, here, it was limited. *Cf. Pitsenbarger*, 2015 WL 1815989, at *10 (finding prejudice from expert's vouching testimony where the "testimony was pervasive—not just a single statement"). And, contrary to King's claims on appeal, the State did not emphasize Miller's false reporting testimony in closing argument. *Cf. id.* (noting the "expert's testimony vouching for T.P.'s credibility was emphasized by the prosecutor during closing arguments"). Instead, the State focused on her testimony about sexual assault victims not remembering "all of the facts right away." We approved of Miller's generalized testimony on that topic on direct appeal. *See King*, 2017 WL 6039990, at *6 ("An expert may testify generally about victim behavior, including delays in reporting events and why recollection may seem inconsistent, just not the validity of the behaviors of *this* victim.").

In assessing the prejudice from the challenged testimony, we have also considered that King presented expert testimony of his own. Forensic toxicologist Michael Rehberg testified for King about "alcohol use and effect." He performed calculations based on the amount of alcohol two of the victims said they consumed and testified one would have been too intoxicated to function, while the other could not have immediately gone from a blackout state to recognizing she was being

assaulted. Defense counsel also presented testimony from clinical psychologist and licensed mental-health counselor Dr. Veronica Lestina, in response to Miller's testimony. She talked about studies concluding that repressed memories, like those with sexual abuse, "can be inaccurate or not true." She also testified that memories encoded during high-stress or traumatic situations have a higher likelihood of being inaccurate, and adding alcohol into the equation alters how memories are encoded. And she touched on the concept of implanted memories being false. Contrary to what Miller had to say, Lestina stated that all the foregoing "is highly regarded by memory scientific community."

Lastly, we agree with the State that the jury's split verdict shows Miller's limited testimony did not prompt the jury to abandon its role to determine credibility. The jury acquitted King on two charges and convicted him of a lesser-included offense on another. This supports a conclusion that the jury did not believe every allegation the victims placed before it, meaning Miller did not usurp the jury's role in determining the credibility of witnesses. *Cf. State v. Myers*, 382 N.W.2d 91, 95 (Iowa 1986) ("[W]eighing the truthfulness of a witness is a matter reserved exclusively to the fact finder."). We accordingly find King failed to prove that, but for the brief testimony by Miller challenged on appeal, a different outcome was reasonably probable.

## IV. Conclusion

We affirm the denial of King's application for postconviction relief, concluding he failed to meet his burden to prove ineffective assistance of counsel.

**AFFIRMED.**